## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

STUDENTS FOR JUSTICE IN PALESTINE
AT THE UNIVERSITY OF FLORIDA,

    *Plaintiff*,

v.

RAYMOND RODRIGUES, et al.,

    *Defendants*.

Case No. 1:23-cv-275

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Daniel B. Tilley (FBN 102882)
Jerry C. Edwards (FBN 1003437)
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION OF FLORIDA
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel.: (786) 363-2714
dtilley@aclufl.org
jedwards@aclufl.org

Hina Shamsi*
Brian Hauss*
Brett Max Kaufman*
Shaiba Rather*
Tyler Takemoto*
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street
New York, NY 10004
Tel: (212) 549-2500
hshamsi@aclu.org

Radhika Sainath*
PALESTINE LEGAL
55 Exchange Pl. Suite 402
New York, NY 10005
312-212-0448

*Pro hac vice application forthcoming*

*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION ..................................................................................1

FACTUAL BACKGROUND ...................................................................2

   I.   Student Activism on College Campuses and Plaintiff's Advocacy.................2

   II.  Events Leading Up to the Deactivation Order ...................................5

   III. Defendants' Unconstitutional Deactivation Order ...........................8

ARGUMENT .....................................................................................11

   I.   UF SJP is likely to succeed on the merits of its First Amendment claim. .....11

      A. The Supreme Court's decision in *Healy v. James* controls this case. ......12

      B. Defendants cannot lawfully deactivate UF SJP because of its affiliation with NSJP. ....................................................................16

      C. The Deactivation Order is viewpoint discriminatory............................18

   II.  Absent an injunction, UF SJP will suffer irreparable injury .........................26

   III. The balance of equities favors granting a preliminary injunction.................27

CONCLUSION....................................................................................29

CERTIFICATE OF COMPLAINCE.......................................................31

## TABLE OF AUTHORITIES

**Cases**

*Baird v. State Bar of Ariz.*,
401 U.S. 1 (1971) ...................................................................................................25

*Boim v. Quranic Literacy Inst.*,
291 F.3d 1000 (7th Cir. 2002) .............................................................................23

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
408 F.3d 1349 (11th Cir. 2005) ...........................................................................11

*Christian Legal Society v. Martinez*,
561 U.S. 661 (2010) ..............................................................................................19

*Democratic Exec. Comm. of Fla. v. Lee*,
915 F.3d 1312 (11th Cir. 2019) ...........................................................................28

*Elrod v. Burns*,
427 U.S. 347 (1976) ..............................................................................................26

*Gay Lesbian Bisexual All. v. Pryor*,
110 F.3d 1543 (11th Cir. 1997) ...........................................................................20

*Healy v. James*,
408 U.S. 169 (1972) ...................................................................................... *passim*

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ........................................................................................... 21, 22

*Keyishian v. Bd. of Regents of the Univ. of N.Y.*,
385 U.S. 589 (1967) ..............................................................................................29

*KH Outdoor, LLC v. City of Trussville*,
458 F.3d 1261 (11th Cir. 2006) ...................................................................... 26, 28

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020) ..............................................................................................26

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ................................................................... 19, 20

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) ...................................................... 11, 26

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) ..................................................... 20, 28

*Sweezy v. New Hampshire*,
354 U.S.234 (1957) ............................................................................ 29

*W. Virginia State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ........................................................................... 19

*Wooley v. Maynard*,
430 U.S. 705 (1977) ........................................................................... 25

## Statutes

Fla. Stat. § 775.33 ...................................................................... 9, 22

## Other Authorities

Ava L. Parker, The Florida College System Council of Presidents Statement on
Free Expression (April 12, 2019) ....................................................... 2

Florida Board of Governors Meeting, Fla. Channel (Nov. 9, 2023) ...................... 17

Denise Royal and Steve Contorno, *Florida University System Says It Has Not
Deactivated Students for Justice in Palestine Chapters*, CNN (Nov. 9, 2023) .... 17

Foreign Terrorist Organizations, U.S. Dep't of State ................................ 23

Jacob Ivey, Divestment and lemon meringue pie: anti-apartheid movements at the
University of Florida in Gainesville (2022) .......................................... 2

## INTRODUCTION

This case involves an egregious violation of students' First Amendment rights. On October 24, 2023, Florida State University System Chancellor Ray Rodrigues, "in consultation with Governor DeSantis," issued a memorandum (the "Deactivation Order" or "Order") ordering the deactivation of Students for Justice in Palestine ("SJP") chapters at public universities in Florida. Plaintiff, the SJP chapter at the University of Florida ("UF SJP"), now fears imminent deactivation by the University. Incredibly, the Deactivation Order does not even purport to punish UF SJP's own advocacy, instead basing its action on the presumptively protected speech of another organization with which Plaintiff has only a loose affiliation. The Deactivation Order violates UF SJP's First Amendment rights to free speech and free association. More than fifty years ago, in *Healy v. James*, 408 U.S. 169 (1972), a public university denied recognition to a student group on analogous facts—and the Supreme Court roundly rejected that effort.

Applying *Healy* here, this Court should grant Plaintiff's motion for a preliminary injunction prohibiting Defendants from enforcing the unconstitutional Deactivation Order. The merits of Plaintiff's First Amendment claim are straightforward, the irreparable harm to Plaintiff's constitutional rights is clear, and the public interest will manifestly be served by a swift injunction against Defendants' unconstitutional conduct.

## FACTUAL BACKGROUND

I.    **Student Activism on College Campuses and Plaintiff's Advocacy**

Throughout American history, students have participated in and benefited

from the marketplace of ideas on college campuses, and Florida's State University

System is no exception. In the 1980s, for example, University of Florida student

groups staged a 40-day sleep-in and protest on campus to express their opposition

to apartheid in South Africa.[1] And in 2019, the Florida College System Council of

Presidents recognized the importance of ensuring that academic institutions

facilitate diverse views, explaining that "it is not the proper role of our institutions

to attempt to shield individuals from ideas and opinions they find unwelcome . . . .

[C]oncerns about civility and mutual respect can never be used as a justification for

closing off discussion of ideas, however offensive or disagreeable those ideas may

be to some members of our communities."[2]

The first SJP chapter was founded in 2001 by students at the University of

California, Berkeley. Compl. ¶ 33. Today, there are over 200 SJP chapters

nationwide. *Id.* Since at least 2009, University of Florida students have maintained

---

[1] Jacob Ivey, Divestment and lemon meringue pie: anti-apartheid movements at the University of Florida in Gainesville, 23:1-2 Safundi 46 (2022), https://www.tandfonline.com/doi/abs/10.1080/17533171.2023.2172743.

[2] Ava L. Parker, The Florida College System Council of Presidents Statement on Free Expression (April 12, 2019), https://www.flgov.com/wp-content/uploads/2019/04/FCS-COP-Statement-on-Freedom-of-Expression.pdf.

an SJP chapter in good standing with status as a registered student organization. *Id.* ¶ 34. UF SJP was founded as a "human rights advocacy organization" in response to "the failure of modern society to produce a just and reasonable solution to the Palestine–Israel conflict." *Id.* ¶ 35. Its goal is to "promote international law, human rights, and justice for all people affected by this conflict." *Id.* Today, UF SJP includes "a diverse membership of people from all faiths and nationalities who believe in the attainability of peace." *Id.* ¶ 36. Currently, the chapter has four board members, and numerous active members. Decl. of Mikaela Boelkins ("SJP Decl.") ¶ 5.

UF SJP engages in a wide range of campus advocacy in service of its mission. It has previously hosted teach-ins on the boycott, divest, and sanctions movement; vigils for Palestinians killed by the Israeli military; social events to celebrate Palestinian culture and food; and film festivals showcasing Palestinian voices and stories. Compl. ¶ 37. Examples of the organization's other political and social advocacy includes issuing statements in support of Black Lives Matter; boycotting the University food court for its association with prison labor contractors; and, together with other student organizations, protesting Florida's "Don't Say Gay" Bill. *Id.* ¶ 38.

The University of Florida currently has "over 1,000 student organizations," touching upon a wide range of interests, including professional goals, religious and

3

cultural beliefs, political and social activism, and sports. *Id.* ¶¶ 22–23. Just like on other college campuses around the country, the University offers a variety of resources exclusive to registered groups, including access to large meeting and event spaces, participation in campus-wide recruitment events, training and leadership development, and funding for activities. *Id.* ¶ 24.

Like other student groups on campus, UF SJP depends on these university resources to fulfill its mission. SJP Decl. ¶ 18. The group routinely reserves space on campus for meetings and events, which can overflow even large lecture halls. *Id.* ¶¶ 19, 17. It uses university facilities to print flyers and handouts important to advertising upcoming events and recruiting new members. *Id.* ¶ 20. The group's access to GatorConnect, an online platform available to registered groups, is necessary for booking event space and posting events on the University-wide calendar. *Id.* ¶ 21. University funds are UF SJP's sole source of funding and used to host speakers and provide food and other materials at events. *Id.* ¶ 20. For example, in March 2023, UF SJP used university funds to purchase supplies for its Palestinian embroidery class. *Id.*

National SJP ("NSJP"), established years after UF SJP, "seeks to empower, unify, and support student organizers as they push forward demands for Palestinian liberation & self-determination on their campuses." Compl. ¶¶ 44–45. UF SJP is affiliated with, but fully autonomous from, both NSJP and other SJP chapters

around the country. SJP Decl. ¶ 22. The two have no financial relationship, either, via dues or otherwise. *Id.* ¶ 25. UF SJP's Constitution states: "NSJP is not an umbrella organization of which we are a subordinate organization. Rather, NSJP serves as a coalition and networking group for SJPs and other like-minded groups on college campuses across the nation." UF SJP Constitution, Article 1 (attached as Ex. B to Decl. of Daniel B. Tilley).

The vast majority of UF SJP's communication with NSJP has come through mass emails sent by NSJP to SJP chapters across the country, and these emails largely contain trainings, advocacy templates, and notices about annual conferences. SJP Decl. ¶ 27. UF SJP may view NSJP's materials as a resource to support its advocacy, but NSJP's resources do not dictate the content or messaging of UF SJP's independent advocacy. *Id.* ¶¶ 28–29. Ultimately, UF SJP's actions and principles are defined by the University of Florida students in their organization on their campus—and no one else. *Id.*

## II.    Events Leading Up to the Deactivation Order

On October 7, 2023, Hamas launched an attack it called Operation al-Aqsa Flood on Israeli soil, killing approximately 1,200 people, the majority of whom were Israeli civilians and more than 30 of whom were children. Hamas also took approximately 240 civilian and Israeli military hostages. Compl. ¶ 51.

In response, the Israeli government launched an intense military operation in the Gaza Strip and a crackdown on Palestinians living in the West Bank. *Id.* ¶ 52. During the ongoing operation, the Israeli military has dropped thousands of bombs in the Gaza Strip, severely limited humanitarian aid from entering the Strip, and at times imposed a communications blockade for Palestinians living there. *Id.* The Israeli government's military response has killed more than 11,000 Palestinians in the Gaza Strip, the majority of whom are civilians and more than 4,600 of whom are children, and injured more than 28,000 people. *Id.* ¶ 53. It has also caused the displacement of more than 1.7 million people. *Id.* ¶ 53.

The humanitarian catastrophe in Gaza and the U.S. government's support for the Israeli government have triggered widespread protests and activism around the world, including here in the United States. *Id.* ¶ 54. Students and student organizations, like UF SJP, are at the heart of this movement.

UF SJP board members were devastated by the tragedy in Israel and the Israeli government's response in Gaza—they were and are consumed by what the next days and weeks might hold for Palestinians. SJP Decl. ¶ 30. Feeling that their campus activism was needed now more than ever, UF SJP board members promptly convened to discuss how to generate support for Palestinian human rights. SJP Decl. ¶ 31. On October 8, they considered hosting a teach-in to educate

other UF students on the history of the Palestine–Israel conflict and UF SJP's criticisms of the Israeli government. *Id.* ¶ 31.

On October 10, NSJP sent a mass email to SJP chapters around the country, including UF SJP, with a link to a document called the "Day of Resistance Toolkit." *Id.* ¶ 32. The toolkit offered messaging resources and a guide to organizing in light of the unfolding events in the region. *Id.* ¶ 32. UF SJP was not involved in or consulted about the conception or drafting of NSJP's toolkit. *Id.* ¶ 33.

The same day, UF SJP issued a statement on its social media account "mourn[ing] the loss of innocent Palestinian and Israeli civilian life." *Id.* ¶ 36. The statement made clear that "the killing of any life is always undignified and heartbreaking" and asserted that "the root of violence, apartheid, and occupation under Israel's far-right government must end for peace." *Id.* The statement concluded: "We hope that no more lives, Israeli or Palestinian, are lost. We pray for those who are suffering." *Id.*

Two days later, UF SJP organized a teach-in to spread awareness about the humanitarian crisis in Gaza and educate the student body on how to show support for Palestinian human rights. *Id.* ¶ 37. The teach-in had unprecedented attendance for a UF SJP event, with more than 200 students participating. *Id.*

Frustrated by what UF SJP believed was the University administration's disregard for the Palestinian civilian deaths in Gaza and the failure to support students perceived as Palestinian and/or Muslim on campus, UF SJP, in conjunction with other student groups, issued another public statement on October 16. *Id.* ¶ 38. The statement stressed that "[v]iolence against all innocent life is unacceptable," and encouraged the University to "condemn[] all violence, antisemitism, Islamophobia, Palestinian erasure, and anti-Palestinian sentiment." *Id.*

On October 17, SJP issued a "call for action" on its social media account. *Id.* ¶ 39. It encouraged its followers continue to show solidarity with the people of Palestine: "organize," "educate," and "protest" to "END the gaza GENOCIDE." *Id.*

## III.   Defendants' Unconstitutional Deactivation Order

On October 24, 2023, Chancellor Ray Rodrigues sent a memorandum to State University System of Florida's Presidents ordering them to deactivate "active NSJP Chapters." Deactivation Order (attached as Ex. A to Decl. of Daniel B. Tilley). The University of Florida is one of these institutions.

Although the memorandum orders the deactivation of SJP chapters, it does not claim that the SJP chapters violated any state or federal law or university policy. It does not allege that UF SJP was involved in the drafting or circulation of NSJP's toolkit. Nor does it claim that UF SJP formally adopted, endorsed, or

8

utilized the NSJP toolkit. It does not contain any direct statements or materials from UF SJP. Indeed, the Order does not mention UF SJP, except insofar as it notes that the chapter exists.

The only entity the Order accuses of wrongdoing is NSJP. The Order claims that the language used in NSJP's toolkit is equivalent to the group being part of or supporting Hamas. *Id.* at 1. To make this claim, the Order links language from two different parts of the toolkit. In the first part, the toolkit refers to Operation Al-Aqsa Flood as "the resistance"; in the second part, the toolkit states that "Palestinian students in exile are PART of this movement, not in solidarity with this movement." *Id.* Based on those two separate statements, the Order concludes that "NSJP has affirmatively identified it is part of the Operation Al-Aqsa Flood—a terrorist led attack." *Id.* That, the Order concludes, is evidence that NSJP has provided material support to a designated foreign terrorist organization, a felony violation of Florida Statute § 775.33(3). *Id.*

Two weeks after the Deactivation Order was issued, while on stage for a national G.O.P. presidential debate, Governor DeSantis celebrated and claimed credit for deactivating state SJP chapters. "I already acted in Florida. We had a group Students for Justice in Palestine. They said they are common cause with Hamas. They said we're not just in solidarity. This is what we are. We deactivated them. We're not going to use state tax dollars to fund jihad." Compl. ¶ 72.

The Deactivation Order references the possibility that student SJP chapters could "form another organization that complies with Florida state statutes and university policies;" however, it did not specify what measures newly formed organizations would need to take in order to comply. *Id.* ¶ 71. Since then, the Chancellor has asserted that SJP chapters in Florida can avoid the harms of disbandment if they associate under a different name. Compl. ¶ 75. Further, on November 9, Chancellor Rodrigues publicly indicated that University officials will "seek an express affirmation" from local Students for Justice in Palestine chapters in Florida that "they reject violence," "reject they are a part of the Hamas movement," and "will follow the law." Compl. ¶ 76.

The Deactivation Order has already cast a significant chill on UF SJP's activities, causing its members to think twice before organizing and advocating for Palestine. SJP Decl. ¶ 43. Although UF SJP is still organizing for Palestinian rights, the looming threat of deactivation hampers its activism. UF SJP board members fear that at any moment the University will disrupt their ability to sustain their growing momentum for their advocacy. Id. ¶ 43, 17. Indeed, in the last month, support for UF SJP by students on campus and others has ballooned. The group has gained 663 Instagram followers, with its advocacy statements now reaching over 9,000 accounts on Instagram. Id. ¶ 17. While the group typically drew about ten attendees at events, one recent event drew an overflowing crowd at a large lecture

10

hall on campus. *Id.* Ultimately, the Deactivation Order directly hampers UF SJP's ability to organize at a time when the group views it as critically necessary because the situation in Palestine is rapidly deteriorating. *Id.* ¶ 41. Rather than focusing on their advocacy, UF SJP students are forced to redirect time and resources towards vindicating their own constitutional rights.

## ARGUMENT

A preliminary injunction is warranted under Federal Rule of Civil Procedure 65 where the plaintiff shows: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant[s] outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)). As set forth below, UF SJP meets all four prongs of this standard.

## I.   UF SJP is likely to succeed on the merits of its First Amendment claim.

Free speech and association are central to all academic institutions, and the First Amendment protects these fundamental rights at public universities. A university's denial of recognition to a student group because of its constitutionally protected speech or associations can therefore be justified only under the most

compelling circumstances. The Deactivation Order, which was promulgated by

Chancellor Rodrigues without any of the procedures prescribed by the University

of Florida's policies for disciplining student groups, does not satisfy this

demanding standard. Indeed, the Order does not allege any wrongdoing by UF SJP.

It instead asserts that NSJP, an entirely separate organization with no authority over

UF SJP, violated Florida's material support statute through statements published in

its "Day of Resistance Toolkit." Deactivation Order at 1. There is no basis for

attributing the statements contained in the NSJP toolkit—which are themselves

presumptively protected by the First Amendment, absent any evidence that they

were published in coordination with, or at the direction of, a designated terrorist

organization—to UF SJP. The Deactivation Order unconstitutionally seeks to

deactivate UF SJP on the basis of: (1) UF SJP's constitutionally protected, and in

any event limited, affiliation with NSJP; and (2) hostility to the views expressed by

NSJP. The denial of recognition to UF SJP under these circumstances violates the

First Amendment.

A.     The Supreme Court's decision in *Healy v. James* controls this case.

In *Healy v. James*, the Supreme Court held, on analogous facts, that a public

university may not deny recognition to a student group because of its affiliation

with a controversial national organization or because of ideological hostility. 408

U.S. at 184–88.

Because the decision is directly on point, it merits discussion at length.

There, a group of students at Central Connecticut State College ("the College")

sought to establish a local chapter of Students for a Democratic Society ("SDS").

Following the College's ordinary procedures, the group requested official

recognition as a campus organization, hoping to create a group that would provide

a "forum of discussion" on American society; act as an "agency for integrating

thought with action so as to bring about constructive changes"; and serve as a

"coordinating body" for "leftist" students and "other interested groups on campus

and in the community." *Id.* at 172.

While the College's SDS chapter would be new, students on other college

campuses had established their own local chapters of the organization, many of

them starting during a "climate of unrest" that "prevailed on many college

campuses" in 1969. *Id.* at 171. These were times of deep conflict and division in

our country. Early in the year, Richard Nixon became President, having

campaigned on a secret plan to end the Vietnam War. That war raged on into its

second decade, a year after the killing of hundreds of civilians by U.S. forces in the

My Lai Massacre sparked national and international outrage. Almost half a million

young people converged on a dairy farm outside of Woodstock, New York, for a

rock festival dedicated to "Peace and Music." In Chicago, the government put

eight young organizers on trial for anti-riot violations in connection with protests

13

during the 1968 Democratic National Convention. The year closed with the first

military draft lottery since World War II.

This climate had led to "widespread civil disobedience on some campuses,

accompanied by the seizure of buildings, vandalism, and arson." *Id.* In particular,

various "SDS chapters on some of those campuses had been a catalytic force

during this period." *Id.* Colleges and law enforcement reacted with great force, in

many cases, and "one of the prime consequences of" their response "was the denial

of the lawful exercise of First Amendment rights to the majority of students by the

few." *Id.*

Against this backdrop came *Healy*. The central controversy over the

establishment of a local SDS chapter at the College was the purported relationship

between the chapter and the national SDS organization ("National SDS"). *Id.* at

185. Some, including the College's president, believed that National SDS had

manifested an "abhorrent" "philosophy of violence and disruption." *Id.* at 187.

Reviewing the students' application to establish a local SDS chapter at the College,

the Student Affairs Committee questioned the chapter's association with National

SDS, but it ultimately approved the application upon the chapter's representations

that it was "completely independent" and "not under the dictates" of National SDS.

*Id*. at 172–73. Nonetheless, the College president, noting that some of National

SDS's aims were in conflict with the College policies, and expressing doubt that

14

the College chapter could truly be independent of National SDS, denied it official recognition. *Id*. at 174–76.

To enforce their rights, the students filed suit. The district court found they were denied procedural due process because the president had based his decision on information outside the student group application process, and ordered the College to hold an evidentiary hearing. *Id*. at 177. At the hearing, the students maintained their independence from the national organization, introduced a statement, and presented testimony from their faculty advisor. *Id*. at 178. The hearing officer introduced portions of a transcript of a hearing before the U.S. House of Representatives Internal Security Committee purporting "to prove that violent and disruptive activities had been attributed to SDS elsewhere and to demonstrate that there existed a national organization that recognized and cooperated with regional and local college campus affiliates." *Id*. Again, the College president denied recognition, citing his continuing fears that the group would disrupt the College's campus environment. *Id*. at 179.

The Supreme Court held the College's "denial of recognition was a form of prior restraint, denying to petitioners' organization [a] range of associational activities" in violation of the First Amendment. *Id*. at 184. Although the Court acknowledged the College's "legitimate interest" in "preventing disruption on campus," it held that the College needed to meet a "heavy burden" to "demonstrate

the appropriateness" of imposing a prior restraint on students' association and speech—and the College could not meet this demanding standard. *Id.* (cleaned up). The SDS chapter's affiliation with National SDS, its speech in support of disfavored philosophies, and the College's unsubstantiated fear that the chapter would disrupt the campus environment were not sufficient bases for restricting the chapter's First Amendment rights. *Id.* at 186–88.

Here, *Healy* compels the conclusion that the Deactivation Order violates UF SJP's First Amendment rights.

**B. Defendants cannot lawfully deactivate UF SJP because of its affiliation with NSJP.**

In *Healy*, the Supreme Court held that the SDS chapter's affiliation with National SDS was not a valid basis for denying recognition to the chapter, emphasizing that the Court "has consistently disapproved governmental action imposing criminal sanctions or denying rights and privileges solely because of a citizen's association with an unpopular organization." *Id.* at 185–86. Before associational liability may be imposed, the Court held, "[t]he government has the burden of establishing" both "a knowing affiliation with an organization possessing unlawful aims and goals, and a specific intent to further those illegal aims." *Id.* at 186.

Although National SDS promoted some political views calling for unlawful action, the Court concluded that these views could not be attributed to the SDS

16

chapter, which had stated that it was "not under the dictates of any National organization," that "the national-local relationship was a loose one," *id.* at 173, and that it "did not identify with all of the National's statements, but wished simply to 'pick . . . certain ideas' from that organization," *id.* at 187 n.16 (alteration in original). The only significant link between National SDS and the chapter was the SDS name, which the chapter had an "unwillingness to eschew," *id.* at 186 n.15, because "the name brings to mind the type of organization [they] wish[ed] to bring across": "a left-wing organization which will allow students interested in such to express themselves," *id.* at 173 n.3. Under these circumstances, the Court found it "clear that the relationship was not an adequate ground for the denial of recognition." *Id.* at 187.

Likewise, here, Defendants cannot impute the statements contained in NSJP's toolkit to UF SJP. As Chancellor Rodrigues himself recently acknowledged, "[t]he constitutions of both" SJP chapters on state university campuses in Florida, including UF SJP, "clearly state their organization is not subservient or under the national Students for Justice in Palestine."[3] UF SJP's

---

[3] Florida Board of Governors Meeting at 2:31:18, Fla. Channel (Nov. 9, 2023), https://thefloridachannel.org/videos/11-9-23-florida-board-of-governors-meeting; *see also* Denise Royal and Steve Contorno, *Florida University System Says It Has Not Deactivated Students for Justice in Palestine Chapters*, CNN (Nov. 9, 2023), https://www.cnn.com/2023/11/09/politics/florida-students-for-justice-in-palestine-chapters.

Constitution provides that NSJP "is not an umbrella organization of which" UF SJP

is "a subordinate organization. Rather, NSJP serves as a coalition and networking

group for SJPs and other like-minded groups on college campuses across the

nation." UF SJP Constitution at 1. UF SJP has no financial relationship with NSJP,

and UF SJP's current board members rarely communicate with NSJP. SJP Decl.

¶¶ 25–26. Although UF SJP reviews and may use resources provided by NSJP,

those resources do not dictate UF SJP's independent advocacy. *Id.* ¶ 29.

UF SJP and NSJP share a common name, but UF SJP was founded first.

Compl. ¶¶ 33, 44. And UF SJP's name connotes solidarity with the broader

Students for Justice in Palestine movement. SJP Decl. ¶ 23. Just as the SDS chapter

in *Healy* could not be penalized for insisting on the right to affiliate with other SDS

organizations through its name, UF SJP cannot be penalized for insisting on

retaining its identity as an SJP chapter.

### C. The Deactivation Order is viewpoint discriminatory.

The Deactivation Order also impermissibly threatens to silence UF SJP

because of the viewpoint expressed by NSJP and inaccurately imputed by

Defendants to UF SJP. *Healy*, however, makes clear that a university "acting here

as the instrumentality of the State, may not restrict speech or association simply

because it finds the views expressed by any group to be abhorrent." 408 U.S. at 187–88.

Even if the Court does not follow *Healy* in treating the Deactivation Order as a form of prior restraint, *see Healy*, 408 U.S. at 184, Defendants' viewpoint-based denial of recognition to UF SJP would still violate the First Amendment. Assuming for the purposes of this motion that the University of Florida's registered student organization program constitutes a limited public forum, *see Christian Legal Society v. Martinez*, 561 U.S. 661, 683 (2010), the restrictions placed on access to that forum must still be viewpoint-neutral and reasonable in light of the purposes served by the forum, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (holding that the University of Virginia could not constitutionally exclude religious viewpoints from the student activities fund).

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "Viewpoint discrimination is . . . an egregious form of content discrimination. The government must abstain from regulating speech when

the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

The Deactivation Order violates this fundamental First Amendment precept because it penalizes UF SJP on the basis of its affiliation with a national organization that has expressed views with which Defendants disagree. It "targets 'particular views taken by' students and thereby chooses winners and losers in the marketplace of ideas—which it may not do." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 (11th Cir. 2022); *see also, e.g.*, *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543 (11th Cir. 1997) (holding that a statute prohibiting any college or university from spending public funds to sanction, recognize, or support any group that promotes lifestyle or action prohibited by sodomy and sexual misconduct laws imposed a viewpoint-based restriction on access to a limited public forum, in violation of the First Amendment).

Even if UF SJP endorsed the views contained in the NSJP toolkit—and, to be clear, it does not—the First Amendment would prohibit Defendants from silencing or punishing the independent expression of such views. Still less can Defendants silence UF SJP merely because it associates with a group that has expressed views Defendants reject.

**D.    Defendants' allegation that UF SJP has engaged in material support for terrorism is baseless and cannot justify the Deactivation Order.**

The Deactivation Order cavalierly suggests that the toolkit statements alone constitute violations of Florida's material support for terrorism statute. Deactivation Order at 1. But, in the absence of any evidence that NSJP published the toolkit in coordination with or at the direction of a designated foreign terrorist organization, the toolkit's statements are protected under the First Amendment. The Deactivation Order does not provide any such evidence.

The Florida statute prohibiting material support to designated foreign terrorist organizations ("FTOs") is modeled on the federal statute, which the Supreme Court has confirmed does not criminalize independent advocacy. In *Holder v. Humanitarian Law Project* ("*HLP*"), 561 U.S. 1 (2010), the Court held that the federal law applied only to the proposed provision of speech that directly trained, and provided expert advice and assistance to, designated FTOs. *Id.* at 7–11. The Court was careful to make clear the reach and limits of its reasoning, specifically contrasting lawful and constitutionally protected "independent advocacy" with services "performed in coordination with, or at the direction of, a foreign terrorist organization." *Id.* at 24. As the Court explained, the federal material support statute "prohibits providing a service" to an FTO, and "a person of ordinary intelligence would understand that independently advocating for a cause

21

is different from providing a service to a group that is advocating for that cause."
*Id.* The Court emphasized that as long as they were acting independently, and not
in coordination with an FTO, "plaintiffs may say anything they wish on any topic,"
and "may speak and write freely about" FTOs, human rights, and international law.
*Id.* at 24–25. The Court also made clear that any other interpretation of the material
support statute would almost certainly violate the First Amendment, writing: "[W]e
in no way suggest that a regulation of independent speech would pass
constitutional muster, even if the Government were to show that such speech
benefits foreign terrorist organizations." *Id.* at 39.

The federal material support statute thus does not apply to independent
political advocacy in support of a terrorist group, even advocacy "that might be
viewed as promoting the group's legitimacy." *Id.* at 32.[4] Unlike the kind of
coordinated training and expert advice provided directly to an FTO at issue in
*HLP*, independent political advocacy is not a fungible "service" akin to financial
contributions. It does not impart a skill that terrorist organizations may use to their
benefit, and it does not directly displace costs so as to effectively subsidize a
terrorist organization's illegal efforts. *Id.* at 36–37. As the Supreme Court
understood in limiting its decision, there is a significant difference between

---

[4] As it must under *HLP*, Florida's material support statute also excludes
independent advocacy from its ambit—and it does so explicitly. *See* Fla. Stat.
§ 775.33(5)(b).

training a terrorist organization and independently expressing political views that are or may be interpreted as supportive of the organization. Such independent advocacy, even when it endorses terrorism and supports a terrorist organization, is speech protected by the First Amendment. *See Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1026 (7th Cir. 2002) (explaining that under the material support for terrorism statute, individuals "may, with impunity, become members of Hamas, praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies of Hamas").

Here, the Deactivation Order offers no evidence whatsoever that NSJP's toolkit was issued in "coordination with, or at the direction of," Hamas.[5] Nor does the Order suggest that UF SJP had any role at all in developing or issuing the toolkit—and, in fact, it did not. SJP Decl. ¶ 33. The Order's reliance on the material support laws to deactivate UF SJP is baseless.

### E.    Defendants may not condition UF SJP's recognition on compelled disavowals of protected speech or association.

The Deactivation Order contemplates that UF SJP's members "may form another organization that complies with Florida state statutes and university policies." Deactivation Order at 1. But the First Amendment does not permit the State to dictate the form in which students choose to exercise their rights to free

---

[5] Hamas has been a designated FTO since 1997. Foreign Terrorist Organizations, U.S. Dep't of State, https://www.state.gov/foreign-terrorist-organizations.

speech and free association. Just as the SDS chapter in *Healy* could not be penalized for adopting the SDS moniker to express the views and concerns of its members, UF SJP's members have every right to express their solidarity with other Students for Justice in Palestine chapters throughout the country by maintaining their own chapter of Students for Justice in Palestine at the University of Florida. Under the First Amendment, they cannot be compelled to choose a different organizational form that is more palatable to Defendants.

Likewise, Defendants may not condition UF SJP's continued existence on the organization's disavowal of disfavored beliefs, speech, or association. Although UF SJP students have not yet been presented with any such ultimatum, Chancellor Rodrigues publicly indicated that state university officials will "seek an express affirmation" from local Students for Justice in Palestine chapters in Florida that "they reject violence," "reject they are a part of the Hamas movement," and "will follow the law." Compl. ¶ 76. UF SJP's Constitution already makes its independent and lawful mission and goals clear, and Defendants may not single it out for these compelled disavowals, which would unequivocally violate the First Amendment. *Healy* recognized that "[a] college administration may impose a requirement . . . that a group seeking official recognition affirm in advance its willingness to adhere to reasonable campus law," because such a "minimal requirement, in the interest of the entire academic community, of *any group* seeking the privilege of recognition"

24

would not infringe the "freedom to speak out, to assemble, or to petition for changes in school rules." 408 U.S. at 193 (emphasis added).

By contrast, a selectively imposed requirement to disavow particular beliefs or associations is a classic First Amendment violation. The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment. Broad and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (holding that a state bar requirement that an applicant "state whether she had ever been a member of the Communist Party or any organization that advocates the overthrow of the United States Government by force or violence" violated the First Amendment). The government bears "a heavy burden" to demonstrate that such an "inquiry is necessary to protect a legitimate state interest." *Id.* at 6–7. And, above all, the government may not "inquire about a [person's] views or associations solely for the purpose of withholding a right or benefit because of what [they] believe[]." *Id.* at 7.

UF SJP has never endorsed the use of violence, let alone Hamas, and it is offensive, stigmatizing, and unconstitutional for the University to require this

student group alone to disavow beliefs and associations that it has never claimed to hold.

## II.    Absent an injunction, UF SJP will suffer irreparable injury.

It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *see also, e.g.*, *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). And the Eleventh Circuit has held that there is a presumption of irreparable harm where, as here, "pure speech" is chilled. *See Siegel*, 234 F.3d at 1178.

As the Supreme Court explained in *Healy*, the "primary impediment to free association flowing from nonrecognition" of a student group is the denial of access to campus resources that are the lifeblood of any student group, including the "use of campus facilities for meetings and other appropriate purposes," 408 U.S. at 181, and use of the student newspaper and bulletin boards "to place announcements regarding meetings, rallies, or other activities," *id*. at 176.

Here, too, deactivation would prevent UF SJP from accessing campus facilities to hold its meetings and events, exclude UF SJP from campuswide recruiting events, and terminate UF SJP's access to the GatorConnect portal that student organizations throughout the university use to publicize their groups and

promote their events. SJP Decl. ¶¶ 18–21. Deactivation would also deprive UF SJP of its sole source of funding, the University of Florida's Student Government. *Id.* ¶ 20. Without funding, UF SJP would be unable to reimburse guest speakers, print promotional materials for events and recruitment, or even offer refreshments to students who join UF SJP events on campus. *Id.*

UF SJP cannot function without these essential resources. *Id.* ¶ 18. "If an organization is to remain a viable entity in a campus community in which new students enter on a regular basis, it must possess the means of communicating with these students." *Healy*, 408 U.S. at 181. Furthermore, UF SJP's "ability to participate in the intellectual give and take of campus debate, and to pursue its stated purposes, is limited by denial of access to the customary media for communicating with the administration, faculty members, and other students." *Id.* at 181–82. The threat of enforcement of the Deactivation Order has already chilled students' interactions with UF SJP. SJP Decl. ¶ 43. If the Deactivation Order is carried out, UF SJP will be silenced on campus, causing further irreparable harm to its First Amendment rights at a time when there is increasing public interest in its advocacy for Palestinian rights.

## III.   The balance of equities favors granting a preliminary injunction.

The threatened injury to UF SJP's First Amendment rights outweighs any damage an injunction might cause Defendants, because the government "has no

legitimate interest in enforcing an unconstitutional [statute]." *KH Outdoor*, 458 F.3d at 1272. Even if government officials—or a court—dislikes a student organization's viewpoints, tolerating those viewpoints is "a cost that 'We the People' have accepted as necessary to protect free-speech interests more generally." *Speech First*, 32 F.4th at 1128.

Moreover, the Deactivation Order does not remedy any actual harm. UF SJP has not violated any laws or University codes of conduct. No harm will ensue if the Court enjoins government officials from attacking a problem that does not exist. Instead, the Deactivation Order directly hampers UF SJP's ability to organize at a time when the situation in Palestine is rapidly deteriorating and open debate and advocacy for Palestinian human rights is vital. *See* SJP Decl. ¶ 41.

## IV.    An injunction would serve the public interest.

"[T]he public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) (citation omitted). And "[n]owhere is free speech more important than in our leading institutions of higher learning." *Speech First*, 32 F.4th at 1128. Academic freedom—uninhibited by state-imposed, viewpoint-based censorship—"is of transcendent value to all of us," *Keyishian v. Bd. of Regents of the Univ. of N.Y.*,

385 U.S. 589, 603 (1967). For this reason, the public interest strongly favors the entry of a preliminary injunction.

The Deactivation Order's viewpoint-based restrictions deny students their constitutionally protected freedoms and "impose a[] strait jacket upon the intellectual leaders in our colleges and universities," which in the long run "imperil[s] the future of our Nation." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). A preliminary injunction against the enforcement of the Deactivation Order would allow UF SJP to continue cultivating intellectual discourse and tolerant, critical thinkers, preserving the status quo until the Court has an opportunity to fully consider the merits of Plaintiffs' claims.

## CONCLUSION

For the foregoing reasons, this Court should enter a preliminary injunction.

Dated: November 16, 2023

Respectfully submitted,

/s/ Daniel B. Tilley
Daniel B. Tilley (FBN 102882)
Jerry C. Edwards (FBN 1003437)
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION OF FLORIDA
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel.: (786) 363-2714
dtilley@aclufl.org
jedwards@aclufl.org

Hina Shamsi*
Brian Hauss*
Brett Max Kaufman*
Shaiba Rather*
American civil Liberties
    union foundation
125 Broad Street
New York, NY 10004
Tel.: (212) 549-2500
hshamsi@aclu.org
bhauss@aclu.org
bkaufman@aclu.org
srather@aclu.org

Aamra Ahmad*
Tyler Takemoto*
American civil Liberties
    union foundation
915 15th Street NW
Washington, DC 20005
Tel.: (202) 457-0800
aahmad@aclu.org
ttakemoto@aclu.org

Radhika Sainath*
PALESTINE LEGAL
55 Exchange Pl. Suite 402
New York, NY 10005
312-212-0448

*Pro hac vice application forthcoming*

*Counsel for Plaintiff*

## CERTIFICATE OF COMPLAINCE

This document complies with the word limit of Local Rule 7.1(F) because, excluding the parts of the document exempted by the rule, this document contains 6,680 words. This document complies with the type-style requirements of Local Rule 5.1(C) because this document has been prepared in a proportionally spaced typeface using the word-processing system Microsoft Word 2016 in 14-point Times New Roman. Because no attorney has entered an appearance on Defendants' behalf, Counsel is unable to meet and confer at this time. Counsel will file an amended Rule 7.1(B) certificate once Defendants' counsel enters an appearance.

Date: November 16, 2023                 _/s/ Daniel B. Tilley_
                                         Daniel B. Tilley