## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

STUDENTS FOR JUSTICE IN PALESTINE
AT THE UNIVERSITY OF FLORIDA,

     *Plaintiff*,

                                   Case No. 1:23-cv-00275-MW/MJF

v.

RAYMOND RODRIGUES, *et al*.,

     *Defendants*.

_____/

## THE BOARD OF GOVERNORS AND CHANCELLOR
## RODRIGUES' RESPONSE IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendants, the Chancellor of the State University System of Florida and

members of the Florida Board of Governors,[1] respectfully respond to Plaintiff's Mo-

tion for Preliminary Injunction (ECF Nos. 3, 3-1).

---

[1] Unless separately discussed, references to the Board or Board of Governors include the Chancellor, who serves as the Chief Executive Officer of the Board of Governors. Also, as noted in Governor DeSantis' Motion to Dismiss, the Governor joins in this Response because the arguments applicable to the Board and Chancellor apply to the Governor as well.

## INTRODUCTION

The events that led us here cannot be overstated. On October 7, 2023, Hamas—a U.S.-designated foreign terrorist organization—committed unfathomable acts of savagery against innocent men, women, children, and babies in Israel.[2] Some of the victims were American citizens.[3] Coined "Operation Al-Aqsa Flood," Hamas carried out these acts on a Jewish holiday.[4]

"[M]ore than 1,500 members of Hamas' death squads purged Israeli villages—killing over 1,400 people, injuring thousands of others, taking at least 200 hostages, and leaving behind a trail of unspeakable horror." Comm. on Foreign Affairs Memo at 2. The carnage perpetrated by Hamas included:

- Murdering civilians in their cars, including women, children, and entire families;

- Assaulting kibbutzim, killing residents and burning homes;

- Holding captive and massacring families in their homes;

- Forcing hostages to lure other civilians out of their homes;

---

[2] Letter from Rep. McCaul to Dep't of State Sec'y Blinken & Amb. Van Schaack, at 1 (Oct. 19, 2023), *available at* https://mccaul.house.gov/sites/evo-sub-sites/mccaul.house.gov/files/evo-media-document/2023-10-19-letter-to-sec.-blinken-amb.-van-schaack-regarding-hamas-genocide-crimes-against-humanity-war-crimes.pdf ("Comm. on Foreign Affairs Memo").

[3] Ex. 39, *available at* https://www.nytimes.com/2023/10/11/us/israel-americans-missing-killed-hostage.html.

[4] *Israel and Hama October 2023 Conflict: Frequently Asked Questions (FAQs)*, Congressional Research Service (CRS Report 47754), at 1, Oct. 20, 2023, V.10 Updated, *available at* https://crsreports.congress.gov/product/pdf/R/R47754.

- Executing babies and children in their beds and carseats;

- Murdering the elderly and posting the evidence on the social media;

- Slaughtering more than 250 civilians attending a music festival at point-blank range;

- Capturing and raping women;

- Kidnapping children;

- Parading and spitting on the dead in the streets;

- Mutilating the bodies of victims; and

- Burning men, women, and children alive.

Comm. on Foreign Affairs Memo, at 2–3. This mass atrocity has been described as the "deadliest attack against the Jewish people in a single day 'since the Holocaust.'"[5]

In the wake of these horrific attacks, antisemitic incidents in the United States have climbed sharply—by as much as 388%. *See United States v. Burke*, No. 19 CR 322, 2023 WL 7110745, at *5 (N.D. Ill. Oct. 28, 2023); *see also Oversight of the Federal Bureau of Investigation: Before S. Comm. on the Judiciary*, 118th Cong. (2023) (testimony of FBI Director Christopher Wray), *available at* https://www.ju-

---

[5] Ex. 40, *available at* https://www.timesofisrael.com/why-a-holocaust-scholar-thinks-comparisons-with-the-oct-7-hamas-massacre-are-valid/.

diciary.senate.gov/committee-activity/hearings/12/05/2023/oversight-of-the-fed-eral-bureau-of-investigation, at 1:13:30 (noting a "388% rise in the anti-Semitic in-cidents since this time last year"). In the words of FBI Director Christopher Wray: "it is a real problem." *Id.* at 2:43:33 ("We've seen bomb threats to synagogues, threats to attack the Jewish community on campuses and other places. We've had multiple arrests."). Because the Jewish community shoulders a disproportionate share of hate crimes, the FBI is "acutely focused on the threats to the Jewish com-munity, which very much needs our help." *Id.* at 2:44:20. This alarming trend is felt in Florida, which is home to the third largest Jewish population in the nation.[6]

College and university campuses are not immune from this striking rise in antisemitism, which has drawn national attention from the press and Congress. *E.g.*, *Condemning Antisemitism on Univ. Campuses and the Testimony of Univ. Presi-dents in the House Comm. on Educ. and the Workforce*, H.R. 927, 118th Cong. (2023), *available at* https://www.congress.gov/bill/118th-congress/house-resolu-tion/927/actions; Ex. 32.[7]

---

[6] Brandeis Steinhardt Social Research Institute, *American Jewish Population Estimates 2020 Summary and Highlights*, at 8 (Mar. 2021), *available at* https://ajpp.brandeis.edu/documents/2020/JewishPopulationDataBrief2020.pdf.

[7] *Also available at available at* https://www.washingtonpost.com/educa-tion/2023/10/31/antisemitism-college-campuses-jewish-hamas-gaza/.

The Board of Governors is constitutionally charged with oversight and governance of the State University System. Art. IX § 7, Fla. Const. Public universities in Florida are in turn obligated to protect the welfare of all students—including Jewish students—and to strike the delicate balance between promoting students' freedom of expression and association and preventing interference with the educational environment in the form of disruption, harassment, and of course illegal activities and violence. The Chancellor's Memorandum respects that balance.

Against this backdrop, public officials in Florida were gravely concerned by the National Students for Justice in Palestine's ("SJP") dissemination of two "toolkits" embracing Operation Al-Aqsa Flood and encouraging disruptive—and sometimes outright illegal—tactics on the University of Florida and University of South Florida campuses. For the reasons discussed throughout, Chancellor Rodrigues' Memorandum endorsing deactivation of Florida's two SJP chapters—University of Florida SJP ("UF SJP") and the University of South Florida SJP ("USF SJP")—was a reasonable reaction that does not run afoul of the First Amendment. Plaintiff's selective presentation of facts does not clearly establish a substantial likelihood of success on the merits.

Plaintiff's Motion should be denied for additional threshold legal failures. Plaintiff is unlikely to succeed on the merits because Plaintiff lacks standing to sue the Board of Governors, including the Chancellor, and its claim is not ripe. Plaintiff

seeks an injunction preventing deactivation but presents no evidence that it faces imminent deactivation. And as to the Board, Plaintiff's request leaves nothing for this Court to enjoin: the Chancellor's Memorandum is not enforceable, and the Board cannot deactivate student groups. While the Board oversees and possesses general enforcement authority with respect to *universities*, it has no direct authority over the recognition, discipline, or deactivation of *student groups*.[8] Universities serve those functions. An injunction prohibiting the Board of Governors from deactivating Plaintiff therefore enjoins the Board from doing what it cannot do.

For the same reasons, Plaintiff cannot show a likelihood of irreparable harm— as opposed to a nebulous fear of possible future actions. The public interest is not served by gratuitously enjoining the Board of Governors from acts it cannot take. Nor would the public interest be served—or any injury redressed—by an advisory injunction that admonishes the Board to follow the law and its regulations.

Plaintiff has not carried its burden to clearly establish a right to preliminary relief. This Court should deny the Motion.

## LEGAL STANDARD

The grant of a preliminary injunction "is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." *United States v. Lambert*, 695

---

[8] The Board delegated to universities the authority to regulate matters related to student groups in Board of Governors Regulation 1.001(4).

F.2d 536, 539 (11th Cir. 1983). "[A] preliminary injunction is an extraordinary and drastic remedy." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). To prevail on a motion for preliminary injunction, a plaintiff must clearly establish that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant out-weighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Id*. "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020).

## LEGAL ARGUMENT

**I.   PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS.**

### a. Plaintiff Lacks Standing Because the Chancellor's Memorandum Is Unenforceable, and the Board of Governors' General Enforcement Authority Does Not Reach Student Groups.

Plaintiff is unlikely to succeed on the merits because it lacks standing to sue the Board of Governors. Standing is an "indispensable" part of the preliminary-injunction analysis and is not a mere pleading requirement. *Shen v. Simpson*, No. 4:23-cv-00208-AW-MAF, 2023 WL 5517253, at *3 (N.D. Fla. Aug. 17, 2023). "A party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). Thus, like the merits of its claim, Plaintiff must clearly establish its Article III standing to obtain

preliminary relief. *Falls v. DeSantis*, 609 F. Supp. 3d 1273, 1281–82 (N.D. Fla. 2022). Plaintiff has not carried this weighty burden.

Plaintiff's heavy reliance on *Healy v. James*, 408 U.S. 169 (1972), illustrates its lack of standing to sue the Board. In *Healy*, the plaintiff student group sued college officials with actual authority to recognize, or not recognize, student groups, and those officials in fact refused to recognize the plaintiff student group. *Id.* at 170–79. By contrast, the Board neither recognizes nor deactivates student groups; that role is filled by the universities. *Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) (citations omitted). ("[W]here, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged, such that an injunction prohibiting enforcement would be effectual.").[9]

And of course, Plaintiff has not been deactivated. These two critical distinctions illustrate that, unlike in *Healy*, Plaintiff in this case has not suffered a concrete injury that is traceable to the Board and redressable by an injunction against the Board.

  i. <u>Injury-In-Fact</u>

Article III requires Plaintiff to show that it "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not

---

[9] The Memorandum was directed only to Universities, inherently recognizing they are the body that has direct purview over the student organizations.

conjectural or hypothetical.'" *Spokeo*, *Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A "concrete injury" must be "real, and not abstract." *Id.* (marks omitted).

Plaintiff has not been deactivated. The Chancellor and Board did not and could not deactivate Plaintiff. The Chancellor's Memorandum is not formal Board action, has no independent legal effect, and cannot be enforced against Plaintiff. Plaintiff has not articulated an actual or imminent injury-in-fact. *See Digital Props*., *Inc. v. City of Plantation*, 121 F.3d 586, 590 (11th Cir. 1997) ("Without the presentation of a binding conclusive administrative decision, no tangible controversy exists and, thus, we have no authority to act.").

Deactivation is the cornerstone of Plaintiff's Complaint. But Plaintiff has not been deactivated by the University, nor has it pleaded or proved facts suggesting that deactivation or any other punishment—from anyone—is imminent. The Chancellor's statements to the Board of Governors indicate the opposite: that the University has no imminent plan to deactivate. *See* https://thefloridachannel.org/videos/11-9-23-florida-board-of-governors-meeting/ (Nov. 9, 2023 Bd. of Govs. Meeting at 2:31–2:34) (explaining that the University of Florida and University of South Florida expressed that

they do not intend to deactivate their SJP chapters at this time) ("Nov. 9 Board Meeting Video").[10]

Critically, Plaintiff has not clearly established that the Board of Governors could deactivate a student group. Rather, Plaintiff acknowledges the University is the entity with authority to deactivate it. ECF No. 1 ¶¶ 22, 30, 78. Plaintiff also acknowledges that University regulations set forth the process the University would afford to any student group, including Plaintiff, facing potential deactivation. *Id*. ¶¶ 28–30.[11] The Chancellor's Memorandum does not purport to dispense with these regulations. Plaintiff presents no evidence that these procedural protections would not apply, that the University has initiated deactivation in accordance with these regulations, or that the Board would play any role in these hypothetical processes. Instead, Plaintiff concedes that "Defendants have not initiated any of the prescribed procedures to determine

---

[10] *See also Students for Justice in Palestine at the Univ. of S. Fla. v. DeSantis*, No. 1:23-cv-00281-MW-HTC (N.D. Fla.), ECF No. 1 ¶¶ 46–48 (quoting from Chancellor Rodrigues' comments at the November 9, 2023 Board of Governors meeting noting that "the universities have not deactivated their university chapters of SJP").

[11] Relevant University policies are published on the University's website: Registered Student Organization Policy 16-003 (https://policy.ufl.edu/policy/rso-classification-officer-eligibility/); Student Code of Conduct Policy 4-040 (https://policy.ufl.edu/wp-content/uploads/2021/12/4-040_2021-12-06.pdf); and Non-Discrimination and Harassment Policy 1006 (https://policy.ufl.edu/wp-content/uploads/2013/03/1006.pdf).

whether UF SJP should be subject to discipline." *Id.* ¶ 32.[12] This lack of evidence demonstrates the prematurity and contingent nature of Plaintiff's claim.

The Chancellor acknowledged at a public Board meeting that their immediate next step was to seek legal guidance to evaluate some of the positions espoused on behalf of the Universities, and to gather additional information regarding the student groups' compliance with laws and policies. *See* Nov. 9 Board Meeting Video at 2:32:00. Neither the Chancellor nor the Board indicated an intent or plan to take any further actions in response. *See id.* at 2:28:00–2:33:53. These statements weigh against a finding that the Board could force deactivation and has plans to do so imminently. Rather, a reasonable listener would likely infer that the Board does not intend imminently to take further steps and that universities drive the deactivation decision. *See NFC Freedom*, *Inc. v. Diaz*, No. 4:23-cv-00360-MW/MAF, 2023 WL 7283920, at *8 (N.D. Fla. Nov. 3, 2023) ("Plaintiffs' source for this quotation also permits a reasonable inference that Defendant Rufo *does not* intend to enforce the challenged provision . . . ."). With no allegations or proof of actual or imminent deactivation, Plaintiff has neither articulated nor proven a concrete injury.

To the extent Plaintiff asserts a chilling effect as its Article III injury, that injury is too speculative to confer standing and, as to the Board of Governors, is objectively

---

[12] Of course, the University is the only Defendant that can or would initiate its own due-process regulations for its student organizations.

unreasonable. While a chilling effect or self-censorship may sometimes constitute a cognizable First Amendment injury, it is not sufficient here because the "mere fear of unconstitutional action alone . . . is too speculative an injury to confer standing." *Club Madonna, Inc. v. City of Miami Beach*, 924 F. 3d 1370, 1381–82 (11th Cir. 2019). "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). "It is not enough that [a] complaint sets forth facts from which we could imagine an injury sufficient to satisfy Article III's standing requirements." *Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir. 2006). Instead, an injury-in-fact must be imminent. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (noting that the "threatened injury must be *certainly impending",* "allegations of *possible* future injury are not sufficient." (emphases in original); *Dream Defs. v. Governor*, 57 F.4th 879, 887 (11th Cir. 2023) ("A threat of future injury is sufficient to establish standing when the threatened injury is certainly impending or there is a substantial risk that the harm will occur." (internal marks omitted)). "Immediacy, in this context, means reasonably fixed and specific in time and not too far off." *Bloedorn v. Grube*, 631 F.3d 1218, 1228 (11th Cir. 2011). Any imminency argument by Plaintiff is undercut by the numerous steps the Board must pursue to take action regarding any university, *see infra* Part I.a.ii., all of which would necessarily require publicly-noticed meetings, *see* § 120.525, Fla. Stat.

To be objectively reasonable (and thus actionable), a chilling effect must carry a "credible threat of prosecution" by the *defendant*—here, the Board. *Pittman v. Cole*, 267 F.3d 1269, 1283–84 (11th Cir. 2001). "[I]f no credible threat of prosecution looms, the chill is insufficient to sustain the burden that Article III imposes." *Id.*; *accord Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998). A plaintiff's claim that it "feel[s] inhibited" is insufficient; "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Younger v. Harris*, 401 U.S. 37, 42 (1971); *accord City of S. Miami v. Governor*, 65 F.4th 631, 638 (11th Cir. 2023) ("[W]e have rejected the argument that plaintiffs have standing based on their subjective fear of harm and its chilling effect." (marks omitted)).

Plaintiff has not shown that it faces a substantially likely threat of future punishment by anyone—and certainly not by the Board. *See Link v. Diaz*, No. 4:21-cv-00271-MW/MAF, 2023 WL 2984726, at *5–6 (N.D. Fla. Apr. 17, 2023) (observing lack of evidence that Board of Governors could enforce challenged statute against individual students or professors, as opposed to institutions, and concluding plaintiffs lacked standing). Instead, Plaintiff rests on its "highly speculative fear" of future action stemming from "the decisions of independent actors"—namely, the University. *City of S. Miami*, 65 F.4th at 637. Absent a credible threat of prosecution by the Board, Plaintiff's asserted chilling effect is insufficient to confer standing.

ii.   <u>Traceability & Redressability</u>

For similar reasons, Plaintiff cannot establish that their claimed injuries are traceable to or redressable by an injunction against the Board of Governors. *NFC Freedom*, *Inc.*, 2023 WL 7283920, at * 4 (noting plaintiffs' obligation to prove their injuries are "redressable with an injunction directed at *these Defendants*" (emphasis supplied)). "[I]t must be *the effect of the court's judgment on the defendant*"—not an absent third party—"that redresses the plaintiff's injury." *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (quotation omitted).

The Chancellor's Memorandum has no independent legal effect and is not itself enforceable.[13] Enjoining its "enforcement" therefore does not redress any injury. Enjoining the Board from deactivating Plaintiff would ring equally hollow, because it cannot deactivate Plaintiff in the first place. The University ultimately controls the recognition and non-recognition of student groups.

The author of the memorandum—Chancellor Rodrigues—has no independent statutory enforcement authority, separate from the Board of Governors as a body. *See* §§ 1001.706, 1008.322, Fla. Stat. To be sure, the Board exercises a general oversight authority over state universities, including general authority to enforce state law. But

---

[13] Plaintiff offers no evidence to the contrary, and none is found in Florida's Education Code.

that general authority does not reach individual students or student groups; that authority is delegated to universities. Thus, the Board's oversight of the State University System does not provide the necessary nexus between the Board and Plaintiff to satisfy Article III. *See Falls*, 609 F. Supp. 3d 1273 (rejecting teacher plaintiffs' argument that Board of Education might withhold funds from school districts pursuant to its general statutory authority; teachers' theory of standing "require[d] the Court to stack multiple layers of inferences" and "require[d] too many inferential leaps to establish standing at the preliminary injunction stage").

An injunction can issue only against state officials with authority to enforce the challenged law. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) ("[P]etitioners do not direct this Court to any enforcement authority the attorney general possesses in connection with S. B. 8 that a federal court might enjoin him from exercising."); *Jacobson*, 974 F.3d at 1241 ("And any injury they might suffer is neither fairly traceable to the Secretary nor redressable by a judgment against her because she does not enforce the challenged law."). Otherwise, with no enforcement authority to enjoin, the injunction redresses no injury traceable to the defendant.[14] In this circuit, general

---

[14] For the same reasons, a suit against the Board falls outside of the *Ex Parte Young* exception to Eleventh Amendment immunity, which requires the defendant to have an enforcement role over the challenged action to justify prospective relief. *Luckey v. Harris*, 860 F.2d 1012, 1015–16 (11th Cir. 1988); *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1137 (N.D. Fla. 2020).

statutory enforcement authority is insufficient to confer Article III standing. *Support Working Animals*, 8 F.4th at 1204; *Lewis*, 944 F.3d at 1298–99.

It is not enough for Plaintiff to assert that the Chancellor's Memorandum endorses future deactivation. By analogy, in *Support Working Animals*, 8 F.4th at 1203–05, the Court held that the Attorney General's participation in the Constitutional Revision Commission's drafting of a proposed amendment to Florida's Constitution was insufficient to establish traceability with respect to the future enforcement of the amendment. Relying on its earlier decision in *Jacobson*, the Court observed that "an official's role in crafting duly enacted legislation can[not] satisfy the traceability requirement," and noted that plaintiffs' injuries instead arose from "the independent actions of . . . the Florida voters" who approved the proposed amendment. 974 F.3d at 1204.

The same is true here. If the University ever deactivates Plaintiff, the Chancellor's role in crafting a Memorandum that anticipated that outcome is insufficient to confer standing to sue the Board.

In *Support Working Animals*, the court also found that plaintiffs' claims were not redressable by enjoining the Attorney General from enforcing the challenged law because the Attorney General did not have enforcement authority. 8 F.4th at 1205. Again, the same is true here: the Chancellor's Memorandum is not enforceable, and the Board does not decide which student groups at Florida's universities will or will

not be recognized. An injunction prohibiting the Board from taking actions it cannot take does not provide redress. *See id*. The Board's general authority under section 1008.322 does not change this result. *Id.* at 1204; *see also Link*, 2023 WL 2984726, at *5 ("Defendant Boards' recent exercise of their general enforcement authority to discipline other actors not before this Court does not move the ball. Those examples involved disciplinary action against governing bodies . . . and not individual professors or teachers who ran afoul of state law or policy.").

Aside from the insufficiency of this generic authority to prove traceability and redressability, Plaintiff offers no evidence that the Board has taken or intends to take any of the steps set forth in section 1008.322 as a means of "enforcing" the Chancellor's Memorandum. It is pure speculation to anticipate what the Board might do in the future or when, or how the resolution of each step in the process might turn out.

To illustrate, even if the Board initiated steps under section 1008.322 to investigate the University's compliance with state law related to Plaintiff's status, Plaintiff must assume the Board would find a violation and then take further undefined steps to achieve compliance by the University. Plaintiff must assume these steps will not only occur, but occur imminently. Plaintiff must also assume that the necessary outcome of these progressive steps would be that, at some point along the way, the Uni-

versity would decide to deactivate Plaintiff. The ultimate (potential) act of deactivation is too attenuated from the Board of Governors, and the interim hypothetical steps are built on too many speculative assumptions to confer standing against the Board.

Even less plausible is the Board's ability to directly reach individual student groups, which are squarely under the delegated purview of their sponsoring institutions. Without evidence or authority showing a nexus between Plaintiff and the Board, "this Court cannot fill in the blanks for Plaintiffs." *NFC Freedom*, *Inc.*, 2023 WL 7283920, at *7; *see also id.* (discussing *Falls* and noting that plaintiff lacked standing to pursue a free-speech claim when the Board's conduct was "only tied to punishing educational institutions").

In sum, an injunction prohibiting the Board from deactivating Plaintiff would not redress any imminent harm, and an injunction prohibiting "enforcement" of the Chancellor's Memorandum is equally futile. Plaintiff failed to establish constitutional standing and is therefore unlikely to succeed on the merits of its First Amendment claim.

### b. Plaintiff's Claim is Not Ripe.

Speculation and assumption, divorced from a concrete and particularized injury, are the hallmarks of an unripe claim. For the same reasons Plaintiff lacks standing, Plaintiff's claims are also unripe. Plaintiff's claim depends on future contingencies that may or may not occur. Further factual development is necessary for Plaintiff's

claim to materialize—and for this Court to adjudicate it. This warrants dismissal on ripeness grounds and precludes the extraordinary remedy of a preliminary injunction.

"The ripeness doctrine involves consideration of both jurisdictional and prudential concerns." *Digital Props.*, 121 F.3d at 589. It is designed "to prevent courts, through avoidance or premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967). Here, Plaintiff's claim is not "sufficiently mature," and the issues are not "sufficiently defined and concrete, to permit effective decisionmaking by the court." *Pittman*, 121 F.3d at 1278. (quoting *Digital Props.*, 121 F.3d at 589).

The Eleventh Circuit's ripeness inquiry evaluates "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Club Madonna, Inc.*, 924 F.3d at 1380 (marks omitted). "Concerning fitness for judicial decision, [courts] ask whether the parties raise an issue that we can decide without further factual development and whether the institutional interests of the court and agency favor immediate review." *Id.* "[C]laims are less likely to be considered 'fit' for adjudication when they venture beyond purely legal issues or when they require speculation about contingent future events." *Pittman*, 267 F.3d at 1278 (marks omitted).

Here, Plaintiff's claim is not fit for adjudication for the reasons articulated in *Club Madonna* and *Pittman*: it does not involve pure legal issues, but instead demands speculation about contingent future events, and therefore cannot be decided without further factual development.

In *Digital Properties*, 121 F.3d at 588–90, the Eleventh Circuit found unripe a First Amendment claim founded on informal representations by a zoning department employee that were not memorialized in a final decision of the zoning department. In concluding the claim was unripe, the court heavily weighed the plaintiff's failure to wait for a "conclusive response" from the decisionmaker. *Id.* at 590. The plaintiff, "in its haste to preserve its perceived First Amendment rights, failed to present a mature claim for review." *Id.*

This Plaintiff made the same mistake. As in *Digital Properties*, the remarks of a single official do not give rise to justiciable claims, and a fear that the University might deactivate it in the future does not impute to the Board of Governors an infringement of Plaintiff's rights. Plaintiff's conviction that its rights have been violated "bred impatience and prompted it to file an unripe claim." *Id.* The Chancellor's Memorandum does not bind anyone, the Board has taken no formal action, and the University has not initiated the deactivation process or indicated any plan to do so. Accordingly, "this action only constitutes a potential dispute" and this Court should decline to resolve it. *Id.* at 591.

20

### c.  The Chancellor's Memorandum Does Not Violate the First Amendment.

The Board of Governors' statement that the University has a basis to take action against Plaintiff does not violate the First Amendment.[15] In addition to lacking standing and ripeness, Plaintiff is unlikely to succeed on the merits of its claim because the issuance of the Chancellor's Memorandum does not violate Plaintiff's First Amendment rights.

The Chancellor's Memorandum has no legal effect on Plaintiff. Plaintiff's claim therefore lacks any state action to which a First Amendment analysis can apply. The Chancellor's demand for action and exhortation to vigilance by Florida's state universities does violate the First Amendment. The First Amendment does not prevent the Chancellor or Board from holding and expressing their own viewpoints. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009) ("A government entity has the right to speak for itself [and] is entitled to say what it wishes." (citations and marks omitted)).

---

[15] As explained in the Board's Motion to Dismiss, Plaintiff's Complaint invokes several strands of First Amendment claims under a single cause of action. For purposes of the preliminary injunction analysis, Plaintiff has failed to establish a likelihood of success on the merits under any theory. *Cf. Christian Legal Soc'y Ch. of the Univ. of Cal. Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 680 (2010) (reasoning that based on the underlying facts and claims, it made "little sense to treat CLS's speech and association claims as discrete" and relying on "limited-public-forum precedents [to] supply the appropriate framework for assessing both" types of claims).

The Chancellor's Memorandum is akin to an open letter, much like the dozens of statements released by public officials across the country on the same topic over the last ten weeks. The Chancellor's Memorandum is no more actionable than these innumerable statements by other public officials.[16] *See Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (finding the government's expression of preferences does not violate the First Amendment, and recognizing the "basic difference between direct state interference with a protected activity and state encouragement of an alternative activity").

Even if the mere issuance of the Chancellor's Memorandum implicated the First Amendment, the Memorandum here does not violate Plaintiff's constitutional rights. At most, a university-sponsored student organization system is a limited public forum, *see Christian Legal Society*, 561 U.S. at 679 n.12, subject to reasonable, viewpoint-neutral restrictions related to the university's educational mission and the goals of the forum, *id.* at 685, 687 n.16; *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995). In this context, content-based restrictions are permissible "if [they] preserve[] the purpose of the limited forum." *Gay Lesbian Bisexual All. v.*

---

[16] This Court need not ignore its independent knowledge of widely-reported public statements. *See United States v. Marino*, 562 F.2d 941, 944 (5th Cir. 1977) (factfinders "are not to be presumed ignorant of what everybody else knows" and "are allowed to act upon matters within their general knowledge, without any testimony on those matters"); *Namphy*, 493 F. Supp. 3d at 1144 ("This Court, like any factfinder . . . does not check its common sense at the door.").

*Pryor*, 110 F.3d 1543, 1549 (11th Cir. 1997). The Chancellor's Memorandum satisfies these principles.

Universities have a "significant interest in ensuring safety and order on campus." *Bloedorn v. Grube*, 631 F.3d 1218, 1238 (11th Cir. 2011). "[P]rotecting the safety and convenience of persons using a public forum is a valid governmental objective." *Id.* (citation and marks omitted); *see also Yeasin v. Durham*, 719 F. App'x 844, 851–52 (10th Cir. 2018) ("[T]the Supreme Court believes that the material-and-substantial-disruption test applies in the university setting").

Universities need not tolerate threats of material disruption in opening a limited forum, or force students to tolerate threats to their education or physical safety. *Healy*, 408 U.S. at 189 ("Associational activities need not be tolerated where they infringe on reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education."); *Jane Doe I v. Valencia Coll. Bd. of Trs.*, 838 F.3d 1207, 1212 (11th Cir. 2016) ("[T]he employees must tolerate the students' complaints about the transvaginal ultrasounds unless they can reasonably forecast that the expression will lead to substantial disruption of or material interference with school activities." (marks omitted)); *Ala. Student Party v. Student Gov't Ass'n of the Univ. of Ala.*, 867 F.2d 1344, 1347 (11th Cir. 1989) (recognizing legitimate interest in "minimiz[ing] the disruptive effect of campus electioneering); *Jenkins v. La. State Bd. of Educ.*, 506 F.2d 992, 1003 (5th Cir. 1975) ("[T]hese organizers

initially provoked the group action which led to the disorder and the disturbances . . .
. The actions of appellants resulted in a material disruption of the campus and of the
rights of others. They were not protected by the First Amendment.").[17]

The Board has a vested interest in ensuring that all of Florida's public universities comply with the law, protect student welfare, and pursue their primary purpose of educating students. *Cf. Ala. Student Party*, 867 F.2d at 1346 ("But this is a university, whose primary purpose is *education*, not electioneering. Constitutional protections must be analyzed with due regard to that educational purpose, an approach that has been consistently adopted by the courts."). When faced with a "reasonable fear" that student groups will jeopardize those ends, the Board is entitled to express those concerns and exhort the universities to be vigilant in fulfilling their obligations. *See id.* at 1346–47 (explaining *Tinker* and noting that school authorities in *Tinker* did not "*reasonably* fear[] school disruption," and concluding that student-organization rules before the court "ought to be assessed on the basis of their reasonableness as well").

---

[17] The Eleventh Circuit noted the somewhat unsettled nature of the jurisprudence in this area in *Sasser v. Board of Regents of University System of Georgia*, No. 21-14433, 2023 WL 2446720, at *5 (11th Cir. Mar. 10, 2023), finding that a university student suspended for using a racial slur at a university-sponsored event could not defeat qualified immunity against individual defendants because his First Amendment rights were not clearly established. *Sasser* shows that *Healy*'s application is limited and that *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), remains relevant authority, at least in part in the university setting, even if not explicitly extended in full. *Sasser* also does not disturb existing circuit precedent recognizing the legitimacy of the State's interest in ensuring order and safety on campus, as well as the preservation of the primary educational mission.

The Chancellor's fears were reasonable. His Memorandum issued against the following backdrop:

- Hamas executed the Operation Al-Aqsa Flood terror attacks on October 7, 2023. Supporters rebranded these attacks as "the Resistance," which has been championed by national and local SJP chapters alike. In the wake of the October 7 terrorist attacks, SJP—including these local chapters—embraced the "resistance" and atrocities in Israel, not just standing in "solidarity" with the acts of Hamas, but as "PART of this movement." *E.g.*, Exs. 20, 23, 29, 30; *Students for Justice in Palestine at the Univ. of S. Fla. v. DeSantis*, No. 1:23-cv-00281-MW-HTC (N.D. Fla.), ECF No. 1 at 26.

- By October 9, 2023, Chancellor Rodrigues and Florida's Commissioner of Education issued a memorandum to university and college presidents condemning the barbaric attacks in Israel and reminding the institutions of their obligations to protect Jewish students. Ex. 27. The same day, state law-enforcement entities issued a memorandum to all Florida law-enforcement agencies encouraging vigilance in their protection of citizens by refamiliarizing themselves with Florida's statutory protections from discriminatory harassment based on religion, including on college and university campuses. Ex. 26. These actions are consistent with the Chancellor's Memorandum and invoke the same concern: protecting the Jewish community and avoiding disruption.

- Since October 7, national and local SJP chapters have promoted and participated in disruptive walk-outs on campuses in Florida and nationwide. UF SJP was among the chapters that promoted and participated in the national walk-out, Exs. 5, 6, 10, 16, 21, and walk-outs also occurred on the campuses of Florida International University and Florida State University, Ex. 9.

- Also in the aftermath of October 7—which national SJP characterizes as a "historic win," Ex. 29 at 1—Plaintiff received two "toolkits" from national SJP instructing and encouraging the implementation of disconcerting tactics on Florida's campuses, including organizing illegal or disruptive demonstrations such as blockades, sit-ins and occupations, walk-outs, coordinated convergence on university spaces such as cafeterias and student centers, and targeted harassment (such as "bird-dogging" and "call-ins"), *see* Ex. 29 at 2; Ex. 30 at 9–12, and the coordination of and participation in protests that contemplate police confrontation and arrests, *see* Ex. 30 at 6-7.

25

- The SJP toolkits amplified the goals of Hamas, celebrating the brutal October 7 attacks and instructing local chapters to use imagery glorifying the terror attacks, like graphics of paragliders, in publicizing SJP events. Ex. 29; Ex. 30. The toolkits advocate armed resistance as both "legitimate" and "necessary," Ex. 29 at 4; *see also* Ex. 20, call for intifada, Ex. 29 at 4, and denounce Israel's right to exist while characterizing all Israelis as non-civilians and therefore justifying their slaughter, Ex. 29 at 3–4.

- In addition to embracing the "Resistance," UF SJP's social-media accounts reveal a disruptive and perhaps illegal "shut down" of Congresswoman Kat Cammack's office for being a "supporter of Israel," Ex. 4, and efforts to organize and encourage student walk-outs in concert with national SJP, Exs. 5, 6, 10, 12, 16, 17, 19, 21, 37. UF SJP also links to national SJP's website on its own Instagram page, Ex. 8.

- The day after the terrorist attacks, USF SJP also took to social media, justifying the unspeakable atrocities a "response" to "Israeli zionists," denying that those atrocities were "terrorism," and proclaiming their stance in "solidarity" with the events of October 7. Exs. 23, 1. USF SJP's stance on "solidarity" with the atrocities perpetrated by Hamas is reiterated in an Official Statement issued by the chapter. *See Students for Justice in Palestine at the Univ. of S. Fla.*, No. 1:23-cv-00281-MW-HTC, ECF No. 1 at 26.

- In the weeks following the terrorist attack, disruption occurred during demonstrations at both the University of Florida and Florida Atlantic University, including injuries and hospitalizations resulting from the UF event and an arrest during a pro-Palestinian rally at FAU. Exs. 7, 31.[18]

---

[18]     *Also available at* https://www.gainesville.com/story/news/local/2023/10/10/uf-vigil-for-israel-victims-leads-to-dozens-injured-hospitalized/71129088007/; *and* https://www.palmbeachpost.com/story/news/local/boca/2023/10/13/israel-hamas-conflict-pro-palestine-march-results-in-3-arrests-at-fau/71168041007/

As the dissemination of the national SJP's two toolkits demonstrate, the national SJP deploys resources, support, and guidance to its local chapters. The Chancellor's Memorandum reasonably observed this relationship. Examples of the nexus between the national SJP and the UF and USF SJP chapters include:

- UF SJP and USF SJP identify themselves as a local "chapter of Students for Justice in Palestine," Exs. 1, 2, 3, and national SJP's has claimed UF SJP and USF SJP as two of its local chapters, Exs. 13, 15.

- National SJP provides resources to UF and SJP, including the "toolkits." *See* ECF No. 1 ¶ 57; ECF No. 1-4 ¶ 29; *Students for Justice in Palestine at the Univ. of S. Fla.*, Case No. 1:23-cv-281 (N.D. Fla. Nov. 20, 2023), ECF No. 1 ¶ 42.[19]

- UF SJP promoted walk-outs organized by national SJP, and multiple Florida universities participated. Exs. 5, 6, 10, 12, 16, 17, 19, 21; *see also* Ex. 9.

- UF SJP has historically promoted and co-signed statements alongside national SJP, Exs. 11, 14, 18.

- Plaintiff's own social-media account links to the national SJP webpage, Ex. 8.

- Plaintiff acknowledged the relationship between its chapter and national SJP, *see* ECF No. 1 ¶¶ 33, 44–49; Ex. 38 at 1 ("SJP is affiliated with National Students for Justice in Palestine (NSJP) operating in the United States").

---

[19] National SJP provides other resources beyond the "toolkits" to local chapters. For example, it advertises that it will reimburse costs associated with a local chapter's attendance at the national SJP conference, Ex. 24, and operates a dedicated "Chapter Support" page, *see* https://nationalsjp.org/support.

Any reasonable observer can identify the obvious nexus between the national SJP and these local chapters—even if that nexus is not formalized or monetized.[20]

After the Memorandum's issuance, the Board received complaint statements against USF SJP from students at USF, *see* Exs. 25, 41,[21] and received dozens of emails expressing concerns about USF SJP specifically, *see* Ex. 28. USF SJP is one of the two chapters identified in the Chancellor's Memorandum, and the substance of the complaints and emails is consistent with many of the concerns underlying the Chancellor's Memorandum. Recently, Rutgers University, a public university in New Jersey, suspended its SJP chapter due to disruptions on campus—the same concern prompting the Chancellor's Memorandum. Ex. 22.[22] Private universities—including Columbia, George Washington, and Brandeis Universities—have suspended their SJP chapters as well. *See* Exs. 34, 35, 36.

---

[20] Among those observers is the New York Times, which acknowledged the intentional absence of bureaucratic relationships between national SJP and its chapters, and nevertheless characterized SJP as a nationwide organization comprised of a network of affiliated chapters with common objectives. *See* Ex. 33, *also available at* https://www.nytimes.com/2023/11/17/us/students-justice-palestine-campus-protests.html.

[21] *See also* Ex. 42, Tweet by @ElbazStarinsky (Nov. 16, 2023), *also available at* https://twitter.com/elbazstarinsky/status/1725297372048027774?s=46&t=ogN6JC9SMWqphCsEESArUg.

[22] *See also* Adam Sabes, *Rutgers Univ. Suspends Students for Justice in Palestine Chapter*, Fox News (Dec. 12, 2023), *available at* https://www.foxnews.com/us/rutgers-university-suspends-students-justice-palestine.

This context underpinned the Memorandum, which is consistent with the Board of Governors' goals of safeguarding public universities' primary educational mission and students' ability to obtain their education on campus. The Eleventh Circuit has thus made clear that deference is owed to the "educational mission of institutes of higher learning" and universities' corresponding "right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education." *Ala. Student Party*, 867 F.2d at 1345; *accord id.* at 1347 ("[T]hese principles translate into a degree of deference to school officials who seek to reasonably regulate speech and campus activities in furtherance of the school's educational mission."). The Chancellor's Memorandum is reasonable considering the forum's educational purpose and implicates only unprotected conduct or expressive activities that are properly constrained in the university context.

With respect to student organizations, the "proper analysis centers on the level of control a university may exert over the school-related activities of its students," especially when the university "need not have [a student-organization system] at all." *Id.* at 1345–46. The First Amendment does not require universities or the Board to sacrifice universities' educational mission or the safety of the university community. *Healy*, 408 U.S. at 189; *Ala. Student Party*, 867 F.2d at 1345–47. Nor must they re-

main muzzled until actual disruption—or violence—breaks out. *See Keeton v. Anderson-Wiley*, 664 F.3d 865, 877 (11th Cir. 2011) (the government need not "allow events to unfold to the extent that the disruption to the program is manifest before taking action" (marks omitted)).

In expressing its concern over national SJP and its nexus to Florida chapters, the Chancellor's Memorandum invoked Florida's material-support statute, § 775.33, Fla. Stat., university codes of conduct, and the well-established legitimate interests in student safety and pursuit of education, ECF No. 1-1 at 2–3—none of which is an unconstitutional viewpoint-based restriction. Plaintiff's objections to the application of those laws and policies may be viewpoint-based, but this does not convert laws and policies that apply to everyone into First Amendment violations. *Keeton*, 664 F.3d at 875 ("Keeton confuses her viewpoint-based objections to ASU's officials' actions with viewpoint discrimination."). The Chancellor's Memorandum does not purport to prohibit, for example, speech or viewpoints critical of Israel or supportive of Palestinian freedom, nor does it support an inference that university regulations or Florida statutes do not apply equally to all similarly situated groups.[23]

---

[23] The Chancellor's recent comments in the press are consistent with the Memorandum by focusing not on protected First Amendment expression, but on harassment, threats, violence, and illegal disruption on campuses. Gabriella Pinos, *Ray Rodrigues discusses free speech on Florida University campuses*, WUSF.ORG (Dec. 16, 2023), *available at* https://www.wusf.org/education/2023-12-15/ray-rodrigues-discusses-florida-university-free-speech-campuses.

Faced with extraordinary tensions and fear on campuses and troubling indicia of disruption from SJP, the Chancellor took a reasonable, proactive step based on policies and laws of general applicability: he exhorted universities to follow their existing legal obligations to ensure SJP chapters do not engage in the unlawful tactics that the national SJP encouraged them to deploy, or in other conduct that would violate university policies or state law. *See* ECF No. 1-1 at 3 (referencing "demonstrations that delve beyond protected First Amendment speech"). This call to "reasonably regulate speech and campus activities in furtherance of the school's educational mission" does not violate the First Amendment. *Ala. Student Party*, 867 F.2d at 1347.

Finally, *Healy*, 408 U.S. 169, is distinguishable. First, the defendant college in *Healy* refused to officially recognize the plaintiff student group. Plaintiff remains active, and no evidence suggests that the status quo will imminently change.

Second, the student group in *Healy* sued the only entity authorized to approve or disapprove of the student group: the college. The Board of Governors has no such authority.

Third, the non-recognition decision in *Healy* is substantively distinguishable. In *Healy*, the college president overruled a committee decision that would have recognized the student group, but the available record did not support the justifications for the President's decision. *Id.* at 173–79. The Court confirmed that a threat of mate-

rial disruption could have constituted a sufficient basis for non-recognition of a student group, as would the student group's refusal to abide by valid campus regulations. *Id.* at 188–189. Unlike in *Healy*, the Chancellor's Memorandum was not the product of "undifferentiated fear or apprehension," *id.* at 191, or a naked imputation of "guilt by association alone," *id.* at 186, but rather of concrete, real-world events, as well as documents sent to Plaintiff encouraging disruption on Florida campuses and openly claiming solidarity with Operation Al-Aqsa Flood.

Jewish students are understandably terrified. Campus communities are on edge, while the national SJP encourages the mobilization of "resistance" and disruption—and justifies armed struggle—across Florida's campuses. Neither the Board of Governors nor Florida's universities must sit silent.

## II. PLAINTIFF FAILED TO DEMONSTRATE A LIKELIHOOD OF IRREPARABLE HARM ABSENT AN INJUNCTION.

There is no indication that Plaintiff will face irreparable harm absent an injunction against the Board. Plaintiff must clearly establish imminent harm that only the issuance of an injunction can avoid. *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). A mere possibility of future harm is not enough.

Plaintiff has articulated a conceivable future harm: deactivation by the University. However, Plaintiff has not clearly established—or even articulated—that this

harm is imminent absent an injunction. Plaintiff has not pleaded or proven, for example, that the University has expressed any intention to deactivate it, that the University's due-process regulations would not apply if the University initiates steps towards deactivation, or how the Board would play any role in the deactivation decision or process.

A preliminary injunction is warranted only when *necessary* to avoid imminent, irreparable harm that will occur "in the absence of its issuance." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975); *see also Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022) (an injunction should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"). An injunction prohibiting the Board from deactivating Plaintiff is not necessary to provide relief—and certainly not complete relief—because, as explained, the Board cannot deactivate student groups. Likewise, an injunction prohibiting Board from "enforcing" the Chancellor's Memorandum is unnecessary because the Memorandum is not enforceable. And an injunction that prohibits the Board from exercising its general oversight authority with respect to the University in a manner that violates Plaintiff's relies on speculation and amounts to an obey-the-law injunction that is equally unnecessary to avoid irreparable harm.

## III.   THE PUBLIC INTEREST WEIGHS AGAINST THE REQUESTED INJUNCTION.

The final factor also weighs against the requested relief. When the party opposing the injunction is the government, the party's and public's interests merge. *Swain*, 958 F.3d at 1091.

Here, the public interest weighs against the requested injunction because no interest is served by forbidding a state entity to do something it cannot do, or to speculatively preclude the Board from properly exercising its legal authority in the future. Similarly, as noted, an injunction directing the Board to refrain from exercising its authority in the future in a manner that violates the First Amendment is a speculative and impermissible obey-the-law injunction that redresses no injury and serves no interest. *See Fla. Ass'n of Rehab. Facilities*, *Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1222 (11th Cir. 2000); *Rhiner v. Jones*, No. 2:15-cv-14319-RLR, 2018 WL 9391726, at *2 (S.D. Fla. Mar. 14, 2018) (denying preliminary injunction in First Amendment retaliation case that was "nothing more than a prophylactic one of assuring that no unconstitutional conduct will occur in the future" (citation and marks omitted)). The final two factors in the preliminary-injunction analysis weigh against enjoining the Board of Governors.

## CONCLUSION

The Chancellor and Board of Governors respectfully request that this Court deny Plaintiff's Motion.

<u>**C**ERTIFICATE OF **C**OMPLIANCE</u>

The undersigned certifies that the foregoing response contains 7,997 words

and therefore complies with the word limitation requirements in Local Rule 7.1(F).

Dated December 22, 2023.

/s/ *Ashley H. Lukis*
Ashley H. Lukis (FBN 106391)
James T. Moore, Jr. (FBN 70023)
Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.
P.O. Box 11189
Tallahassee, Florida 32302-3189
Telephone: 850-577-9090
ashley.lukis@gray-robinson.com
tim.moore@gray-robinson.com
andy.bardos@gray-robinson.com
*Attorneys for Defendants, Florida*
*Board of Governors of the State*
*University System and Chancellor*
*Rodrigues*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that, on December 22, 2023, this notice was filed through the Court's

CM/ECF system, which will send a notice of electronic filing to all counsel of rec-

ord.

/s/ *Ashley H. Lukis*
Ashley Lukis (FBN 106391)
GRAYROBINSON, P.A.