IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

STUDENTS FOR JUSTICE IN PALESTINE
AT THE UNIVERSITY OF FLORIDA,

   *Plaintiff*,

v.                                              Case No. 1:23cv275-MW/MJF

RAYMOND RODRIGUES, *et al.*,

   *Defendants*.

_____/

**THE BOARD OF GOVERNORS AND CHANCELLOR RODRIGUES'
REPLY IN SUPPORT OF MOTION TO DISMISS**

Defendants, Chancellor Rodrigues and the members of the Board of Governors of the State University System of Florida (collectively, the "Board of Governors" or "Board"), respectfully reply in support of their Motion to Dismiss (ECF No. 37).

**I.   Plaintiff cannot explain how the Board of Governors could enforce a memorandum against a student group.**

Plaintiff's Reply[1] adds no clarity to its vague request for an injunction prohibiting the Board from "enforcing" or "carrying out" the Chancellor's

---

[1] This Reply will refer to Plaintiff's Combined Reply in Support of a Preliminary Injunction and Opposition to Defendants' Motions to Dismiss (ECF No. 41) as "Plaintiff's Reply." Similarly, citations to ECF No. 36—the Board's Response to Plaintiff's Motion for Preliminary Injunction—are only to those portions of the Response that were incorporated by reference into the Board's Motion to Dismiss, *see*

Memorandum. ECF No. 41 at 15, 41. The Chancellor's Memorandum has no independent legal effect, and the Board has no enforcement authority over student groups. Plaintiff offers no authority to the contrary and does not explain what specific actions the Board should be enjoined from taking.

Plaintiff dismisses as "baseless" the Board's characterization of the Memorandum as unenforceable, ECF No. 41 at 36–37, yet points to no legal mechanism to enforce the Memorandum. Instead, Plaintiff emphasizes the Memorandum's single use of the word "must." *E.g.*, ECF No. 41 at 11, 16, 29, 31–32. But word choice alone does not cloak correspondence in legal significance it otherwise lacks. This language does not elevate a memorandum to the status of a Board regulation, statute, executive order, or other binding act.

Plaintiff does not show that the Memorandum is binding on anyone. Nor does Plaintiff point to any legal mechanism by which the Chancellor's Memorandum could be "enforced" against Plaintiff, or even against the University. Any hypothesized future action against the University by the Board is not based on fact, but on speculation, and would stem from a pre-existing legal framework—not on a non-binding memorandum from the Chancellor.

---

ECF No. 37 at 1–2. Because the Board's Reply is limited to those issues set forth in the Motion to Dismiss, this Reply cannot address the merits arguments raised in Plaintiff's Reply. Those arguments must wait for the hearing.

Plaintiff's ultimate demand is an injunction prohibiting the Board from "inducing" Plaintiff's deactivation—a claim too vague and subjective to survive scrutiny. *See* Fed. R. Civ. P. 65(d) (requiring injunctions to "state its terms specifically" and "describe in reasonable detail . . . [the] acts restrained or required"); *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1362 (11th Cir. 2019) ("An injunction . . . should be phrased in terms of objective actions . . . ." (marks omitted)). With no enforceable state action behind its request, Plaintiff asks to enjoin public officials from urging or advocating a desired result. Plaintiff cites no legal authority for the proposition that a public official can be enjoined to retract a public statement based on the subjective reaction of someone who disagrees or feels threatened, or that the proper role of Article III courts includes ordering public officials to issue retractions of their non-binding calls for action. *Cf. Kennedy v. Warren*, 66 F.4th 1199, 1208 (9th Cir. 2023) ("The letter's widespread dissemination may have put pressure on Amazon to act, but not in a way that *Bantam Books* prohibits. Generating public pressure to motivate others to change their behavior is a core part of public discourse, and [the constitution does not] require legislators to refrain from such speech or advocacy.' In fact, any such right 'would stand the Constitution on its head' by cutting off political discourse." (citations omitted)).

3

**II.   The Board's oversight of the University system, including its general enforcement authority in section 1008.322, does not establish a "credible threat" of enforcement against Plaintiff.**

Plaintiff does not articulate how the Board would "induce or compel" deactivation, ECF No. 41 at 41. Plaintiff invokes section 1008.322, Florida Statutes, which sets out the Board's general enforcement authority over institutions. But whether the Board would ever invoke section 1008.322 on these facts, and what the outcome might be, is purely speculative, and an injunction aimed at section 1008.322 would be premature.

The Eleventh Circuit has rejected Plaintiff's argument that general oversight authority can be used to confer standing absent a showing that the authority could be used against *the plaintiff*, and that there exists a credible threat to do so. ECF No. 36 at 13–18. The Board's oversight of universities therefore does not create a credible threat that the Board can enforce the Memorandum against Plaintiff. Still, Plaintiff claims that an injunction would provide redress if it prohibited the Board from exercising its authority under section 1008.322 to "compel" the University to deactivate Plaintiff. But no such purely compulsory authority exists, and Plaintiff's argument that the Board would exercise its authority in any manner is speculative.

To be sure, the Board oversees the State University System, and part of that oversight includes the enforcement tools set forth in section 1008.322. The Chancellor can investigate allegations of a *university's* noncompliance with state statute or Board

4

regulation, can determine probable cause, and can report his findings to the Board at a publicly-noticed meeting. § 1008.322(3)(a), Fla. Stat. The Board can request information from universities, *id.* §1008.322(2), and, upon a report of probable cause, can require a university to document compliance with the law or regulation at issue, *id.* § 1008.322(3)(a). If the university cannot document compliance, the Board can order the university to comply within a specified time frame. *Id.* § 1008.322(4). If the university remains unwilling or unable to comply, the Board may initiate a number of actions in response: it may withhold certain funds, declare the university ineligible for certain grants, require periodic reporting on noncompliance, and report the university's noncompliance to the Legislature. *Id.* § 1008.322(5). These actions can be directed only to a university, and only upon formal board action. No provision of section 1008.322 allows the Board to dictate how a university must discharge its operational and administrative functions—and especially not those functions that are expressly delegated to the university, like oversight of student groups, *see* Fla. Bd. of Govs. Regul. 1.001(4).

Three critical limitations prevent Plaintiff from using these enforcement tools to create standing.

*First*, under section 1008.322, the Board of Governors' enforcement tools are available only to (i) remedy violations of state law or Board regulations, (ii) and only *by universities*—not violations of memoranda, and not violations by student groups.

5

*Second*, whether the Board ever proceeds under section 1008.322 to remedy some violation of law by the University is wholly speculative. Plaintiff has not identified the law or regulation the University would be suspected of violating, or how; how the University would respond to such an allegation; what the outcome of the University's efforts to show compliance would be; what steps the University might take to achieve compliance; and in the case of continued non-compliance, what tools the Board would or would not employ in response.

It is anyone's guess whether these processes would ever start, or when—or what the outcome would be. Plaintiff's theory might be a fine premise for a Choose Your Own Adventure novel,[2] but it does not create a "credible threat" of enforcement, or a justiciable controversy under Article III.

*Third*, general oversight authority cannot establish redressability in the absence of evidence that the defendant intends to, or has threatened to, exercise that authority against the plaintiff. *See* ECF No. 60 at 6–7, 15–17. Here, there is no evidence or allegation that the Board has threatened or intends to use its general enforcement authority over the University to try to achieve deactivation. And as a matter of law, the Board's enforcement authority can never reach Plaintiff—only institutions.

---

[2] *See Entm't Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051, 1056 (N.D. Ill. 2005), *aff'd,* 469 F.3d 641 (7th Cir. 2006) ("[T]hey also parallel popular books, such as the *Choose Your Own Adventure* series, which enable readers to make decisions about how the plot and characters will develop.").

§ 1008.322(3)–(5), Fla. Stat.; *cf. Falls v. DeSantis*, 4:22CV166-MW/MJF, 2023 WL 3568526, at *7 (N.D. Fla. May 19, 2023) ("[T]he likelihood that an injunction against the Board members would directly redress his free speech injury was merely speculative at the time given the Board's general authority to punish constituent institutions rather than individual professors."); *Link v. Diaz*, 4:21CV271-MW/MAF, 2023 WL 2984726, at *4–5 (N.D. Fla. Apr. 17, 2023) ("Plaintiffs point to no law or rule that specifically ties any general supervisory or enforcement authority over the institutions within the Boards' jurisdiction to enforcement of the recording provision against individuals in this case."); *Falls v. DeSantis*, 609 F. Supp. 3d 1273, 1283 (N.D. Fla. 2022) (finding lack of traceability when plaintiff relied only on defendant board's general statutory enforcement authority).

Plaintiff invokes distinguishable case law in an effort to establish a credible threat of enforcement (which is required to establish an objectively reasonable chill) and to establish traceability and redressability. Plaintiff relies on *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), to argue that formal authority to punish is not required to give rise to a credible threat of enforcement—an observation that is partially true, but is incomplete and lacks context.

In *Bantam Books*, the defendant commission did not itself arrest and prosecute booksellers, but was duty-bound to report booksellers to police and the Attorney General if found carrying unsuitable publications. *Id.* at 65–68. It threatened to carry

out that duty in communications directly to the plaintiffs. *Id.* at 65–68. The commission was created for the sole purpose of rooting out and censoring disfavored books and publishers, and its charge was codified in the state law that created the commission. *Id.* at 60–62, 65–68. The Court emphasized the lack of procedural safeguards for publishers or opportunity for review of the commission's actions, which accomplished an end-run around the process and burdens required for criminal prosecutions for obscenity. *Id.* at 70–72. These facts were central to the Court's decision in *Bantam Books* and are absent here.

Plaintiff also cites *Speech First v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022), which involved a challenge to a university's facially content-based speech code. The speech code applied to students, and the defendants were university officials. *Id.* at 1114–18. It comes as no surprise that university officials were proper defendants in a case involving the university's own speech code.

In deciding *Speech First*, the Eleventh Circuit observed that indirect pressure can under some circumstances constitute an actionable chill on First Amendment rights, even if the defendant lacks the formal power to punish, citing *Bantam Books* and *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003).[3] *Id.* at 1122–24. But the context

---

[3] *Okwedy* is distinguishable for the same simple reason that it involved a direct threat by the defendant against the billboard company that carried the plaintiffs' message. In *Okwedy*, the Borough President's threat was explicitly critical of the plaintiff's speech as "unnecessarily confrontational and offensive" and "not welcome in our Borough," and implied negative economic consequences to the billboard company if not

of this observation matters. The Court's analysis stemmed from its disagreement with the district court's conclusion that the plaintiff lacked standing to challenge one part of the speech code because the internal committee charged with monitoring the provision lacked formal authority to punish students. *Id.* Instead, the committee could intake complaints and refer them to other university actors (including university police) to impose punishment. *Id.* The defendant had ultimate enforcement authority, the committee was created by the university (comprised of university students and employees), and the university's speech code was enforceable directly against university students. *Id.* at 1114–18, 1122–24. The defendant in *Speech First* was not a third party, and enforcement of the speech code did not lie in a third party's hands.

Similar to *Bantam Books*, the Court in *Speech First* placed importance on the purpose for which the committee was created, and its codified obligation to refer speech-code violations to administrators and law enforcement. *Id*. at 1122–24. Unlike this case, the defendant in *Speech First* had direct authority over students, and the challenged action was specifically directed to students.

---

removed. 333 F.3d at 341–42. In contrast, the Chancellor's memorandum says no such thing. It does not say that messages supportive of Palestinian rights and freedom are unwelcome, and contained no threat of retaliation against the University if the University does not deactive Plaintiff. Instead, the Memorandum is clearly concerned that SJP's network of chapters considers itself part of a movement that engages in terrorist attacks, and thus emphasizes the necessity for complying with "Florida state statutes and university policies" and "providing a safe environment" on campuses. ECF No. 1-1.

9

Plaintiff also tries to distinguish *Falls v. DeSantis*, 609 F. Supp. 3d 1273 (N.D. Fla. 2022), but the analogy is spot on. ECF No. 41 at 21. The complete quotation Plaintiff excerpts is as follows:

> Plaintiffs' logic goes like this: pursuant to its statutory authority, the Board of Education will withhold funding from the teachers' school districts if they violate the challenged provisions. *See* § 1008.32(4)(b), Fla. Stat. . . . In turn, members of the schoolboard will withhold money from the teachers' individual schools—or, perhaps, put pressure on officials at those schools to discipline the teachers. In other words, the teachers' theory of traceability and redressability flows from the Board to the school district, from the school district to the teachers' school, and—only then—to the teachers. Thus, Plaintiffs' argument requires the Court to stack multiple layers of inferences."

*Falls*, 609 F. Supp. 3d at 1283. This is a clear rejection of general oversight functions as a means to confer standing on individuals who are outside the scope of a board's enforcement authority.

In reaching to distinguish *Falls*, Plaintiff claims that "[t]he BOG has the power to compel the University of Florida to deactivate UF SJP." ECF No. 41 at 21–22. Saying so does not make it true. Conspicuously absent from Plaintiff's statement is any citation to supporting legal authority.

Finally, Plaintiff fails to show that a credible threat of enforcement exists vis-à-vis the University—the entity Plaintiff concedes is ultimately responsible for accomplishing deactivation. *See* ECF No. 41 at 19–20; 16–17 ("First, the Order creates a credible threat of deactivation by the University of Florida."). Plaintiff does not claim that the University intends to—or even threatened to—deactivate it.

Plaintiff also offers no rebuttal to the Board's observation that the University's robust due-process procedures must be exhausted before deactivation is accomplished—or not—by the University. *See, e.g.,* Univ. of Fla. Regul. 4.040, *Student Honor Code and Student Conduct Code*, at 25–52.[4] The University's regulations contain elaborate procedures for hearings and the imposition of sanctions such as deactivation, complete with procedural safeguards that have not been invoked. The Board does not participate in these procedures or dictate their outcome. It is pure speculation whether the University will ever even initiate those procedures. It is not even known yet who the decision-maker would be. For example, the University's procedures entitle student organizations to a hearing and provides the student organization the option of selecting the Student Conduct Committee ("SCC") as the decision-maker. *See* Univ. of Fla. Regul. 4.040(5)(a)18. & (6)(g)(3)c.1. At least one half of the SCC consists of students. *Id*. It is impossible to predict whether the SCC— or other hearing body that Plaintiff might select as the decision-maker—would impose the sanction of deactivation.

Plaintiff's claim requires this Court to guess whether the University's deactivation procedures would be invoked and on what grounds, and what the outcome of that deliberative process will be. This guesswork defeats both standing and ripeness.

---

[4] A copy of UF Regulation 4.040 is attached for ease of reference.

11

### III. Plaintiff's claim of a "chilling effect" is conclusory and contradictory.

Plaintiff offers only boilerplate assertions that the Chancellor's Memorandum has chilled its First Amendment activity. Even at the dismissal stage, Plaintiff's claim cannot survive on mere conclusions without a plausible factual basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). There is no chilling-effect exception to *Iqbal*'s pleading requirements.

Plaintiff states, without supporting facts, that a few students are fearful of deactivation or punishment by the University. ECF No.1-4 ¶¶ 40–41, 43. This allegation is conclusory and insufficient to survive dismissal, let alone a more demanding evidentiary standard. It is also disproven by Plaintiff's own words. According to Plaintiff, its Instagram account has gained 663 new followers and reaches 9,000 accounts, and while its "previous events typically drew 10 attendees, one recent event attracted an overflowing crowd at a large lecture hall on campus." ECF No. 1-4 ¶ 17. Plaintiff's own evidence reveals an eruption of First Amendment activity, refuting any claim that its First Amendment activities have been chilled. *See also id.* ¶ 45 ("Despite our fear of being punished, investigated, and disbanded, other UF SJP board members and I are still determined to stand up for our morals and spread awareness in our community about the rights and cause of Palestinian people.").

Plaintiff nevertheless asserts that its speech is chilled because the threat of deactivation is not "chimerical"—i.e., not farcical or fanciful—and that it need not

12

wait for the "axe [to] fall" before an injunction could issue. ECF No. 41 at 18, 39. Of course, pre-enforcement challenges are cognizable under certain circumstances. But Article III still applies in the pre-enforcement context, and requires more than a non-"chimerical" possibility that someone, someday, might somehow cause an injury.

Plaintiff argues that the mere existence of the Memorandum is enough. But injury alone does not satisfy Article III, and chill alone does not confer standing. If that was enough to establish redressability and traceability, public officials would risk violating the First Amendment every time they made a public utterance that someone subjectively perceived as hostile. This stretches Article III too far.

IV. **Plaintiff's response to the Board's ripeness argument is unconvincing.**

Plaintiff repeats its boilerplate assertion that its speech is chilled by the prospect of future deactivation by the University, reiterates that the Chancellor's Memorandum exists, and concludes that based on these facts, its claim is ripe. These cursory observations fall short of establishing that Plaintiff's claim is "sufficiently mature," is presently "fit for adjudication," and does not "require speculation about contingent future events," *Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001); *accord Elend v. Basham*, 471 F.3d 1199, 1211 (11th Cir. 2006).

Plaintiff contends that only a legal question is before this Court., ECF No. 41 at 28, This an oversimplification of the issues and completely sidesteps the threshold issue of standing. *Id.* Plaintiff does not rebut the Board's explanation of why factual

13

development is necessary to avoid premature federal adjudication before state administrative processes have even begun. *See* ECF No. 36 at 17–20. Abstention on ripeness grounds will provide this Court the opportunity to adjudicate a fully-formed dispute in the future—between the correct parties—should it ever arise.

### CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing reply contains 3,197 words and therefore complies with the word limitation requirements in Local Rule 7.1(F).

/s/ *Ashley H. Lukis*
Ashley H. Lukis (FBN 106391)
James T. Moore, Jr. (FBN 70023)
Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.
301 S. Bronough St., Ste. 600
Tallahassee, Florida 32301
Telephone: 850-577-9090
ashley.lukis@gray-robinson.com
tim.moore@gray-robinson.com
andy.bardos@gray-robinson.com
*Attorneys for Defendants, Florida Board of Governors of the State University System and Chancellor Rodrigues*